## THE LADY PIKE.

1. Though on appeals in admiralty, involving issues of fact alone, this court will not, except in a clear case, reverse where both the District and the Circuit Court have agreed in their conclusions, yet in a clear case it will reverse even in such circumstances.

2. The master of a steamer which undertakes to tow boats up and down a river where piers of bridges impede the navigation, is bound to know the width of his steamers and their tows, and whether, when lashed together, he can run them safely between piers through which he attempts to pass. He is bound also, if it is necessary for his safe navigation in the places where he chooses to be, to know how the currents set about the piers in different heights of the water, and to know whether, at high water, his steamers and their tows will safely pass over an obstruction which, in low water, they could not pass over.

3. The owners of steamers undertaking to tow vessels are responsible for accidents, the result of want of proper knowledge, on the part of their captains, of the difficulties of navigation in the river in which the steamers ply.

APPEAL from the Circuit Court for the Eastern District of Wisconsin.

The Germania Insurance Company had insured a cargo of wheat, laden on a barge at Shockopee, on the Minnesota River, and about to be towed by the steamer Lady Pike down that river to its junction with the Mississippi, thence down the Mississippi to Savannah, Illinois; "*unavoidable dangers of the river* . . . only excepted."

The cargo was laden on the barge, and the transportation

of it begun. In the course of the voyage, however, the barge was wrecked. The insurance company paid the loss, and alleging that the barge had been wrecked owing to the negligent manner in which the steamer had towed her, filed a libel against the steamer to recover what had been paid for the loss. The owners of the steamer set up that the wrecking had been caused by an "unavoidable danger of the river," and was, therefore, within the dangers from which they had excepted themselves. And whether the catastrophe was caused by an "unavoidable danger of the river," or by the steamer's negligence, was the question.

The case was thus:

In April, 1866, there stood in the Mississippi River, just above St. Paul's, certain piers of a bridge then in process of construction, beginning on the west side of the river and numbered 1, 2, 3, 4, and 5; pier No. 3 (a turn-table pier) being so far unfinished as that *when the river was high*, barges like that on which this wheat was laden could pass in safety over it; though when the water was low they could not. In low water the pier was exposed. Owing to a gravel point on the west side of the river which projected itself a little way into the stream, and against which the water struck, the current, in high water especially, rebounded and ran diagonally across the piers towards the east shore, so that "a boat in going between piers No. 3 and No. 4 would drift from four to six feet towards pier No. 4." Hills bounded each side of the river for many miles along its course, with occasional openings, or "coolies" as the navigators call them, through which winds blow, that at other places on the river are arrested by the hills. One of the openings or coolies existed on the west side of the river opposite to these piers. The space between piers No. 3 and No. 4 when No. 3 was above the water, was about 116 feet; that between No. 2 and No. 4 (when No. 3 was below the water) was 264 feet; that between No. 4 and No. 5 was 151 feet. The main part of the channel was between No. 3 and No. 4; there was the draw of the bridge, and it was between those piers that boats and tows going down the river, and sufficiently

narrow to pass through in safety, usually went. The passage between No. 4 and No. 5 was at one time obstructed by a sunken barge, but this was after the time of the transit now under consideration. That passage—the passage between No. 4 and No. 5—at this time was clear and of sufficient depth for the Lady Pike and her tow to have passed in safety.

In this state of things, it was—the rivers Minnesota and Mississippi being at the time full with the spring waters—that the Lady Pike, a stern-wheel steamer, "a high boat, which would catch a good deal of wind on her sides," set off from her moorings with three barges in tow, laden with six hundred tons of wheat; a tow which was to be styled a heavy tow. One barge, larger than the other two, was lashed on one side, and the remaining two upon the other.

The width of all the vessels, steamer and barges when close alongside each other, was 105 feet. They were all stanch, and the steamer abundantly provided with men, including two master mariners and two pilots. Scudding clouds prevented the day from being absolutely clear, and "puffs, gusts, or squalls of wind," came up from time to time. These had "bothered" the pilot nowhere, however, in a way worth mentioning, and the vessels had had no trouble except a little in going between the piers of another bridge higher up the stream, between which, however, they had got safely.

On approaching the piers just above St. Paul, of which we are now principally speaking—the vessels being under a headway of about seven miles an hour—no squall *then* blowing, and no "slow-bell" having been sounded, the pilot of the steamer, judging by his eye, and thus judging, being under the impression that he could do so safely, attempted to run his steamer and its tow between piers No. 3 and No. 4. He was apparently ignorant of the exact width of his steamer and its tow, ignorant also of the exact distance between the two piers, and ignorant besides of the fact that in the then height of the water he could have run *over* pier No. 3; and ignorant in addition or not appreciative of the diagonal effect of the current as it set in high water be-

tween the piers. The result was that one of the barges struck pier No. 4, and was wrecked.

The captain and other officers of the steamer swore that *just as they were going through the piers,* a squall arose and drove the barge against the pier; that the accident arose through no negligence, and was an unavoidable danger of the river.

The District Court held that this was the true view of the case, and dismissed the libel. The Circuit Court affirmed the decree, and the case was now brought here by the insurance company for review.

*Messrs. J. M. Carlisle and J. D. McPherson, for the appellants:*

1. *If the catastrophe did arise from a squall just as the craft was passing between the piers No. 3 and No. 4, still the decrees below were clearly wrong.* The master had no business to be between piers No. 3 and No. 4 at all; and he was there only because he was ignorant of certain capital matters which he was bound to know, and a knowledge of which, had he possessed such knowledge, would have certainly taken him elsewhere than between *those* piers, and have prevented his being there, and so have prevented the catastrophe which occurred. We mean to say that he did not know the width of his craft, the width of the strait through which he was about to carry it; the fact that he need not, in the then high state of the river, have attempted to run between pier No. 3 and pier No. 4 at all, but might have sailed right *over* pier No. 3, and so, for his craft of 105 feet wide, have had a passage 264 feet wide; a width absolutely safe. He was ignorant also of the fact that a current would affect him, and in his effort to run his craft of 105 feet wide through a space of 116 feet would of itself alone carry him six feet out of his course. Moreover, the captain was bound to know that wind might meet him (if any did meet him) at the "cooly" opposite the piers, and to be prepared for it. If there was a squall it doubtless came through the "cooly."

2. *Had it been necessary to run between piers No. 3 and No. 4*

*the speed was too great.* The captain should have gone under a very slow bell. The space between the piers being just wide enough to get through, the craft could, of course, pass in some way. Had he been going *very slowly*, the barge might have grazed, rubbed, been strained, but she might not have been wrecked. In case of touching the pier her chances would have been infinitely better when going slowly, than when dashing ahead at the rate of seven miles an hour. We simply put this point, asserting however, broadly, generally, and as our principal point, that the vessels should not have been in such a Dardanelles at all, where a puff of wind could wreck them, and would not have been there but for the ignorance of the captain of matters which it was his high duty to be acquainted with.

3. *The accident was not caused by wind.* Admitting that the wind might have risen at the very and exact instant of time that the craft was going through the piers—a singular coincidence, it may be safely said, and one requiring the fullest proof—yet no one pretends that it was a great wind, a hurricane. Yet the laws of physics show that nothing short of a great wind, a hurricane, and this too rising in an instant, could have produced this catastrophe.

[The learned counsel then went into a calculation in physics, taking what they assumed that the evidence showed as to the weight of the cargo, the weight of the boats, the surface which they exposed to the wind, the depth to which they were in the water, the fact that the steamer had not careened, and the place in the barge which was opened, and the part of the pier at which she struck, to show that it was impossible that anything short of a hurricane could have driven the steamer and her tows sufficiently far, during the time that she was between the piers before the catastrophe occurred, to have made the collision. This part of the argument they pressed with great apparent confidence.]

*Mr. T. D. Lincoln, contra:*

This being a case presenting a question of fact merely, and there having been two full hearings—one in the District

Court and one in the Circuit Court on appeal—and upon both hearings the case having been decided against the libellants upon the merits, this court will not reverse the decree below, except upon a *very* clear case made. This is the well-settled practice of the courts of the United States and of this court.*

1. The loss was caused by the act of God; a sudden gust of wind, and there was no want of care and skill. This point is made out in the proof.

The passage taken was the main channel. It was under the draw; presumptively, therefore, the very and exact right place through which to pass.

The case of *Amies* v. *Stevens*,† given to us by the old but good reporter Sir John Strange, is in point. Strange thus reports it:

"The plaintiff puts goods on board the defendant's hoy, who was a common carrier. Coming through bridge, by a sudden gust of wind, the hoy sunk, and the goods were spoiled. The plaintiff insisted that the defendant should be liable, it being his carelessness in going through at such a time; and offered some evidence, that if the hoy had been in good order, it would not have sunk with the stroke it received, and from thence inferred the defendant answerable for all accidents, which would not have happened to the goods in case they had been put into a better hoy. But the C. J. held the defendant not answerable, the damage being occasioned by the act of God. For though the defendant ought not to have ventured to shoot the bridge, if the general bent of the weather had been tempestuous; yet this being only a sudden gust of wind, had entirely differed the case, and no carrier is obliged to have a new carriage for every journey; it is sufficient if he provides one which, without any extraordinary accident (such as this was), will probably perform the journey."

Other cases are to the same effect.‡

---

* The S. B. Wheeler, 20 Wallace, 385; The Spray, 12 Id. 367; The Hypodame, 6 Id. 223; Newell v. Norton & Ship, 3 Id. 267, 268.

† 1 Strange, 127.

‡ Colt v. McMechen, 6 Johnson, 165; Ready v. Steamboat Highland Mary, 17 Missouri, 464; Hays v. Kennedy, 41 Pennsylvania State, 383.

Reply.

If a navigator was to desist proceeding on his voyage because there was a possibility of an injury, he would never do anything. There is the possibility, perhaps even more, of the loss of a ship every time she crosses the ocean, yet, if fair nautical judgment is used, and a loss happens by an act of God, or a peril of the sea, it is held to be inevitable, and the carrier is excused. He must use his judgment. He is not bound to have the highest nautical skill in the world or a better judgment than all other people, any more than he is bound to have the best vessel in existence.

The day was fair, and there was no appearance of wind at the time they approached the piers, and the barges having no means by which they could have been floated down between the piers, and being towed in the usual manner through a place that must be passed, clearly there was no want of that care or foresight in not anticipating and guarding against this gust of wind.

2. Want of care in the speed of the Lady Pike as she approached the piers is alleged. Clear proof would be required that all the officers on watch had neglected anything in relation to passing these piers. They knew their boat and how the tow handled, and how best to pass the piers. Probably with a stern-propeller where a course is rightly taken, the highest speed—that which shoots right through—is the safest; manœuvring in such places with stern-wheeled vessels is difficult.

3. The opposing counsel endeavor to bring certain mathematical problems to bear upon this question. The trouble with all such calculations is that they have no certain bases to rest upon. The calculation and rule are not admitted to be correct, but if the rule applied were so, of what use would it be without certain data? There is nothing in the case so definite and well defined that will enable us to apply the rules of mathematics to it. All is speculation upon uncertainties and is only made plausible by assuming things not proved and not true.

*Reply:* We fully admit the position of the other side—

one which we long ago contended for in this court*—that this court will not reverse on questions of fact where the District and Circuit Courts have concurred, except in a clear case. And it is because this case *is* clear, and only because it is so, that we ask a reversal.

Mr. Justice CLIFFORD delivered the opinion of the court.

Appeals in admiralty, it may be admitted, are not favored where it appears that the subordinate courts have both concurred in the same view of the merits of the controversy; but it is not accurate to say that the Supreme Court will not reverse such a decree in a clear case.

Such a proposition cannot be adopted, as a rule of decision, consistently with the provisions in the act of Congress allowing appeals from final decrees rendered in the Circuit Court to the Supreme Court, in all cases of equity and of admiralty and maritime jurisdiction, where the matter in dispute, exclusive of costs, exceeds the sum or value of two thousand dollars.

Decrees of the kind were formerly required to be removed here for re-examination by a writ of error, but the Congress subsequently repealed those regulations, and provided that appeals should be allowed in all such cases, and that upon such appeal a transcript of the libel, bill, answer, depositions, and all other proceedings of what kind soever in the case, shall be transmitted to the said Supreme Court. Provision is also made by that act that new evidence may be received here on the hearing of such appeals in admiralty and prize cases, which affords very strong support to the proposition that the facts, as well as the law of the case, are open to revision by this court in the exercise of its appellate jurisdiction.

Considerable weight undoubtedly in such a case should be given to the decree of the subordinate court, and hence the rule, which is well settled, that the burden is on the appellant to show that the decree of the subordinate court is

---

* See argument of counsel in Newell *v.* Norton & Ship, 3 Wallace, 265.

erroneous, but it is a mistake to suppose that this court will not re-examine the facts as well as the law of the case, as the express command of the act of Congress is that the Supreme Court shall "hear and determine such appeals," which makes it as much the plain duty of this court to re-examine the evidence in the case as the questions of law presented for decision.[*]

Wheat of the quantity and quality specified in the libel was delivered by the shipper to the master of the steamer at the place mentioned in the libel, to be transported from the port of shipment to the port of Savannah, in the State of Illinois. Such a shipment it was not expected would be laden on board the steamer, as she was not constructed nor fitted for the stowage of grain in bulk, nor was it in the contemplation of either party that the wheat would be shipped and transported to the port of destination in that way, as the shipper as well as the carriers knew that such freight was accustomed to be stowed in bulk in barges belonging to the carriers, and that the respondent steamer was employed in towing barges so laden with such cargoes.

Pursuant to that usage the wheat in question was stowed in bulk on board the barge described in the libel, and the barge, with two others of like character, similarly laden, was taken in tow by the steamer, which furnished the motive power for the whole craft, and the proofs show that the several barges, as well as the steamer, were commanded by the same master and manned by the same crew. They, the steamer and barges, were all arranged abreast, the larger barge being lashed to the starboard side of the steamer, and the smaller of the other two being lashed to the port side of the steamer, between the steamer and the starboard side of the barge containing the wheat which is the subject of litigation.

Different estimates are made by the witnesses as to the width of the whole craft as arranged, but the evidence taken as a whole convinces the court that the steamer and the

---

* The Baltimore, 8 Wallace, 382; The S. B. Wheeler, 20 Id. 385.

three barges combined, including the guards of the steamer and the planking of the barges, could not have been less than one hundred and five feet, even if they were all closely lashed together, which is highly improbable.  Lashed as they were, broadside to broadside, of course the stem of the steamer was much in advance of some or all of the respective stems of the barges, as she exceeded in length, even the largest barge, more than fifty feet.  Barges for transporting such products were furnished by the carriers, but the wheat was put on board the barge by the shipper, it being the duty of the carrier to have agents present to oversee and regulate the stowage.

Sufficient appears in the pleadings and proofs to support the proposition that the wheat, when stowed in the barge and delivered to the master, was in good order and condition, and that the master, when he received the wheat, contracted with the shipper to transport and deliver the same, in like good order and condition, to the consignees at the port of destination, as when received at the port of loading, " the unavoidable dangers of the river and fire only excepted," and the libellants allege that the master did not so transport and deliver the wheat to the said consignees, although no dangers of the river or fire prevented him from so doing. Instead of that, the libellants charge that he, the master, and his mariners and servants, so negligently and carelessly conducted themselves in the navigation of the steamer and barges that the barge containing the wheat was sunk in the river, and that the wheat became and was a total loss.

Process was served and the claimants appeared and filed an answer, in which they admit the shipment of the wheat and the contract of the master to transport and deliver the same, as alleged in the libel, but they allege that the sinking of the barge and the consequent loss of the wheat were occasioned by the unavoidable dangers of the river, and they deny that the sinking of the barge was caused by any negligence or carelessness on their part or on the part of those navigating the steamer or barge which contained the wheat; and they also allege that when passing in the usual channel

between the piers in the river, near St. Paul, in the usual way, the steamer and barge were by a sudden gust of wind blown to the larboard, so that the barge containing the wheat struck the pier on that side of the barge, which caused the barge to sink, as alleged in the libel. Proofs were taken and the District Court, after hearing the parties, entered a decree dismissing the libel. Hearing was again had in the Circuit Court on appeal, and the Circuit Court entered a decree affirming the decree of the District Court. Whereupon the libellants appealed to this court.

Errors assigned here are in substance and effect as follows:

1. That the steamer and barge were not properly manned, nor were they fit for the voyage, as neither the master nor pilots had either the requisite knowledge of the vessels under their command or of the dangers and difficulties of the navigation which they had to meet in the course of the trip down the river.

2. That the pilot improperly endeavored to steer the craft midway between piers Nos. 3 and 4 when he ought to have known that the latter pier was so far under water that the craft might have safely passed over it, as was usually done in times of high water, by which improper and unnecessary act the barge containing the wheat was brought within five and a half or six feet of the pier which she struck, whereas if the pilot had steered the craft farther to the westward and passed over that pier, as he should have done at that stage of the water, the distance to the piers on either side of the craft would have been so great as to have avoided all danger of collision.

3. That the craft might have been navigated in safety between piers Nos. 4 and 5, which are one hundred and fifty-one feet apart, showing that the craft might have been navigated through that pass, leaving a space on either side of twenty-three feet, which is manifestly too great to have been overcome by the alleged gust of wind.

4. That the speed of the steamer with the barges in tow, in passing between the piers, was improper and unwarrantable, and was the efficient cause of the disaster and loss.

5. That it was the course of the current, which was unknown to the pilot, that drove the craft to the leeward, and not the wind, as alleged in the answer, and the libellants allege that the pilot, if he had had proper knowledge of the navigation, might have prevented that movement of the craft by the exercise of due skill in steering.

1. Applied exclusively to the number of the steamer's company, the complaint contained in the first assignment of errors would not be well founded, as the crew was sufficient in number, and the proofs show that the steamer had on board two pilots and two master mariners, but the gravamen of the complaint is that neither the master in charge of the deck nor the pilot had any sufficient knowlege of the craft under their command, nor of the dangers of the navigation in passing down the river in such a steamer with three such barges in tow arranged in the manner before described.

Proof of the most satisfactory character is exhibited that they did not even know the width of the craft, as the same was arranged, nor the actual distance between the piers where the disaster occurred. On the contrary it appears that they both over-estimated the width of the space between the piers, and under-estimated the width of the tow, including the steamer, as they were arranged abreast, the distance between the two first-named piers not exceeding one hundred and sixteen feet and the width of the whole craft being at least one hundred and five feet. Nor does the fact that the pier on the starboard side was so far under water that the craft might have passed over it palliate the rashness of the act, as the evidence shows that both the master and the pilot were ignorant of that fact, and that as they approached the place of danger they put the steamer upon a course to cause the whole craft to pass midway between those two piers, which brought the port side of the barge containing the wheat within five and a half or six feet of the pier on that side which was not submerged in the water.

2. Attempt is made to excuse the master and pilot for endeavoring to pass midway between those piers, upon the ground that they did not know that it would be safe to pass

over the pier on the starboard side, but the sufficiency of that excuse cannot be admitted, for two reasons: (1.) Because they ought to have known both the dangers and the facilities of navigation before undertaking the responsible duties in which they were engaged. (2.) Because it was their duty, if they believed that the pass in question was restricted to the distance between the two piers, to have taken the other pass, which the evidence shows has the width of one hundred and fifty-one feet.

Opposed to that is the suggestion that the wider passage was obstructed by a sunken barge, but the evidence satisfies the court that the alleged obstruction did not exist at that time, and that the disaster that caused that barge to sink occurred at a later period.

3. Unobstructed as the wider passage was, it was plainly a rash act to attempt to pass down the narrower passage on a course which brought the port side of the barge containing the wheat within five and a half or six feet of the pier on that side, which act can only be accounted for upon the ground of negligence and inexcusable ignorance of the dangers and facilities of the navigation, as it was evidently a hazardous experiment to attempt to pass between those piers if the craft could not pass over the pier on the starboard side, and it is equally clear that it would have been safe to have steered between the piers forming the wider passage, which it seems never occurred to the master or pilot.

4. Even if such an attempt could be justified at all on a windy day when the water was high, it is quite clear that neither skill nor good judgment was exercised in setting the course of the craft before passing between the piers. Beyond all doubt some allowance, though the margin was small, should have been made for the leeway of the craft, as the evidence is convincing that the course of the current at high water tends somewhat to force the craft towards the pier on the port side. Besides they had met with some difficulty previously during the trip that day, at the bridge higher up the river, and, therefore, were forewarned that a like difficulty might again occur.

Ignorance of the danger before them is no sufficient excuse, as the owner appoints the master and is bound to select one of competent skill and knowledge, to transport goods and merchandise shipped on board in safety, which necessarily imposes the obligation to employ a master mariner who knows enough about the route to avoid the known obstructions and to choose the most feasible track for his route. Knowledge of the kind, in river navigation, is peculiarly essential, as the current frequently shifts from one side towards the other, and the track of navigation is often obstructed by snags, sand-bars, and shoals, which no degree of skill would enable the mariner or pilot to avoid without a prior knowledge of their existence.

Cross-currents between the piers of bridges which span the river somewhat diagonally are not infrequent, and as they are not always fully appreciable to the casual observer, it is important that master mariners should know of their existence and something of their force, in order that they may be able to steer their steamer or other vessel properly through such a passage. Neither the master nor pilot, in this case, knew that there was any such cross-current between these piers, and consequently took no precaution to guard against its influence.

Carriers of merchandise by water, seeking general employment, are to be regarded as common carriers, and like common carriers by land, in the absence of any legislative provision prescribing a different rule, are in general to be held responsible as insurers, and consequently are liable in all events and for every loss or damage to the merchandise, unless it happened by the act of God, the public enemy, or by the act of the shipper, or by some other cause or accident, without any fault or negligence on their part, as expressly excepted in the bill of lading or contract of shipment.

Standard authorities show that the first duty of the carrier, and one that is *implied by law,* is to provide a seaworthy vessel, well furnished with proper motive power, and furniture necessary for the voyage. Necessary equipment is as requisite as that the hull of the vessel should be stanch and

strong, and she must also be provided with a crew adequate in number and competent for their duty with reference to all the exigencies of the intended route, and with a competent and skilful master, of sound judgment and discretion, and with sufficient knowledge of the route and experience in navigation to be able to perform in a proper manner all the ordinary duties required of him as master of the vessel.

Owners of vessels, employed as such carriers, must see to it that the master is qualified for his situation, as they are responsible for his want of skill and knowledge in that behalf and for his negligence and bad seamanship. In the absence of any special agreement to the contrary or exception in the bill of lading or contract of shipment, his duty extends to all that relates to the loading as well as the safe-keeping, due transportation, and right delivery of the goods, and for the faithful performance of all those duties the ship is liable as well as the master and owners.*

5. Differences of opinion may arise as to the merits of the fourth assignment of errors, and inasmuch as enough is alleged in those which precede and follow it to show that the decree of the Circuit Court must be reversed, the court here does not find it necessary to determine the question whether the speed of the steamer, in view of the conflicting testimony upon the subject, was or was not greater than the exigencies of the impending peril would justify.

6. Nor is it necessary to express any decided opinion whether the fifth assignment of error is or is not supported by the evidence exhibited in the case, but it is deemed proper to say that there is much reason to conclude that it was the course of the current that forced the craft to the leeward, and not the gust of wind, as was supposed by those in charge of the deck of the steamer at the time the barge was sunk.

Enough appears to show that the bridge there does not span the river directly across the current, and that the ten-

---

* Abbott on Shipping, 344; Laveroni v. Drury, 8 Exchequer, 166: Clark v. Barnwell, 12 Howard, 272; The Cordes, 21 Id. 27; King v. Shepherd, 3 Story, 349; 3 Kent, 213; 1 Smith's Leading Cases, 7th ed. 387; 1 Smith's Mercantile Law, 386.

dency of the current is to force the vessel passing down the river to the leeward, and the evidence is full to the point that neither the master nor the pilot had any knowledge that they would have to encounter any such difficulty in attempting to effect the passage between those piers. Support to that proposition is found in the fact that they did not think it necessary to adopt any precaution to prevent such a disaster, except to see that the craft headed midway between the piers of the narrow passage and to give the steamer a full head of steam, so as to make the passage as quick as possible, which shows beyond all doubt that little or no use could be made of the helm during the passage, except to steady the craft on the course adopted just before they entered the passage between the piers where the disaster occurred.

Reliable means to ascertain with certainty what force it was which caused the craft to make leeway during the pas sage is not exhibited in the record, nor is it necessary to decide that point, as it was plainly a rash act to undertake to steer the craft through that passage on a windy day when the banks of the river were full, in the face of the dangers which the evidence satisfies the court would necessarily be encountered in such an attempt. Neither the state of the water nor of the wind was such as to furnish any just excuse for the master or pilot, as they might have chosen the other passage or have taken proper and seasonable measures to leave back one of the barges for the next trip.

Shipowners are responsible for such a disaster if it results from the ignorance, unskilfulness, or negligence of the master or those in charge of the vessel. Where the master, being ignorant of the coast, sailed past the port to which he was destined and ran into another port in the possession of the enemy and was captured, the Court of King's Bench unanimously decided that the implied warranty to provide a master of competent skill was broken by sending out one who was unable to distinguish between the two ports.*

---

* Tait v. Levi, 14 East, 482.

Ignorance and unskilfulness being proved, the attempt to set up inevitable accident is vain, as such a defence can never be sustained even in a collision case, unless it appears that neither party is in fault.   Loss or damage occasioned by such a disaster, where it appears that those in charge of the deck were incompetent to perform the required duty, either from inexperience or want of knowledge of the route, or from negligence or inattention, cannot be regarded as being the result of natural causes, nor as falling within the exception contained in the bill of lading or contract of shipment.

Different definitions are given of what is called inevitable accident, on account of the different circumstances attending the disaster, but there is no decided case which will support such a defence where it appears that the disaster was occasioned by the incompetency, unskilfulness, or negligence of the master or pilot in charge of the deck.\*

Service was not made in this case upon the barge, and of course the decree must be founded upon the fault of the steamer and those who were responsible for the unskilfulness and bad judgment exercised in her navigation. ·

DECREE REVERSED with costs, and the cause remanded with directions to enter a decree for the libellants and for further proceedings in conformity

TO THE OPINION OF THE COURT.

---

\* The Morning Light, 2 Wallace, 560; Union Steamship Co. *v.* New York Steamship Co., 24 Howard, 313.