## MYLROIE v. BRITISH COLUMBIA MILLS TUG & BARGE CO.

(Circuit Court of Appeals, Ninth Circuit.   October 4, 1920.)

No. 3448.

1. **Towage ⊙⟳14—Towing company cannot contract against liability for unseaworthiness.**

    In a contract to perform towage service there is a warranty implied by law that the towing tug shall be seaworthy, properly equipped, and manned by a crew adequate in number and competent for their duty with reference to all the exigencies of the intended voyage, which may reasonably be anticipated, and the contractor cannot relieve himself by anything in the contract from liability for failure to provide these essentials.

2. **Towage ⊙⟳11(1)—Failure of tug to keep lookout is negligence.**

    Failure of a towing tug to provide a lookout stationed forward while navigating dangerous waters at night in stormy weather *held* culpable negligence, and to render the tug unseaworthy, and tug and owner liable for stranding of the tow.

3. **Towage ⊙⟳11(1)—Custom cannot relieve tug from duty to maintain lookout.**

    A custom to the contrary cannot relieve a towing tug from the legal duty to maintain a proper lookout, especially at night in dangerous waters.

4. **Towage ⊙⟳11(1)—Sudden change of course by tug without warning gross negligence.**

    The action of a towing tug in suddenly changing her course at night, without warning to her tow, resulting in a jerk that broke the tow's shackle and cast her adrift, causing her wreck on the shore of an island, *held* gross negligence, which rendered tug and owner liable for the loss.

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska; Robert W. Jennings, Judge.

Suit in admiralty by A. W. Mylroie against the British Columbia Mills Tug & Barge Company. Decree for respondent, and libelant appeals. Reversed.

The appellant, as owner of the barge Bangor and cargo, brought this libel in the court below against the appellee, Tug & Barge Company, for damages sustained by reason of the barge going ashore on Mary Island while in tow of the appellee's tug Commodore. The libel, as twice amended, alleged in substance the barge to be a vessel of 511 gross registered tons, and that it was at all times in question staunch and seaworthy, and properly equipped, manned, and supplied for a voyage from the port of Seattle, in the state of Washington, to the port of Anchorage, in the district of Alaska, of which barge the libelant was the sole owner; that on March 22, 1917, the barge, laden with a cargo of lumber and general merchandise, of the greater part of which the libelant was the owner, and of the remainder of which he was the lawful bailee for hire, sailed in tow from Seattle, bound for Anchorage, Alaska, and by agreement of the respective parties to the libel was on the way picked up by the tug and taken in tow for the rest of her voyage to Anchorage; that the tug proceeded with the barge in tow, arriving off Port

⊙⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Simpson, British Columbia, at about 5 p. m. of the evening of the 25th of the month, without accident or casualty, the glass then being low and the wind east-southeast and rising; that the tug, with the barge in tow, proceeded on the voyage, without any lookout stationed on the tug; at about 2 o'clock in the morning of the 26th of March, 1917, still off and close to the east shore of Mary Island, in the waters of southeastern Alaska, in a heavy sea and snowstorm, and with the wind blowing east-southeast at the rate of about 60 miles an hour, said tug with the barge in tow then being out of her course, and being under a full head of steam and sighting land, through the negligence and want of reasonable care, caution, and maritime skill upon the part of those in charge of her, put her wheel hard over, and suddenly changed her course to avoid the dangers of·reefs and rocks on the east shore of Mary Island, and by reason of the sudden strain and due to the sudden change of course of the tug at full speed, the shackle to which the towline from the tug was attached was broken and the barge went adrift; that immediately the barge's bow anchor was hove out with 55 fathoms of chain, which fetched the barge up, after which, by reason of the force of the wind and sea, she drifted in about 20 minutes on the east shore of Mary Island, where about 2½ hours after being cast adrift she finally grounded, resulting in the damage for which the·libel was brought, aggregating $33,562.47.

The libel as amended further alleged that at the time the towline parted the barge was following properly and carefully in the wake of the tug and obeying all her directions, and that there was a competent man at the wheel on the barge; that nothing could have been done by the barge to prevent the shackle from parting, or to prevent the barge from drifting and grounding, all of which was caused solely by the negligence and want of reasonable care, caution, and maritime skill on the part of those in charge of the tug; that immediately prior to and at the time the tug picked up and took the barge in tow, as alleged, and at all times thereafter during the voyage and towage, up to and including March 26, 1917, the tug was unseaworthy, in that it was improperly and insufficiently manned, and had not a sufficient crew to enable it to station a proper or any lookout on the tug at any time, and especially at night. By his second amendment the libelant alleged in substance that at the inception of the towage the tug was unseaworthy and was insufficiently manned, in that she did not have a sufficient crew to maintain a legal lookout on the vessel during the voyage.

In its amended answer the respondent and claimant, after making certain admissions and denials, set up a written contract under which it alleged the towage in question was done, the pertinent provisions of which are as follows:

"Memorandum of agreement made the 14th day of March in the year of our Lord one thousand nine hundred and seventeen, between the B. C. Mills Tug & Barge Co., Limited, whose registered office is situated in the city of Vancouver, in the province of British Columbia (hereinafter called the tug company), of the one part, and Anchorage Supply Co., of Seattle, Washington, and Anchorage, Alaska (hereinafter called the charterers), of the other part, witnesseth: ,.

"1. That the tug company agree to tow during the spring, summer, and autumn of the year 1917 the barge Bangor on a succession of round trips between the western boundary line of United States waters, and Anchorage, Alaska, for the sum of $4,500 for each such round trip, the said barge to be loaded on the north-bound trip and light on the south-bound or return trip.

"2. The tug company will employ their tug Commodore in said service, barring accident to hull and/or machinery, government requisition, or other causes beyond the control of the said tug company.

"3. That the tug will render to the said barge Bangor reasonable assistance from time to time in any emergency which might arise, and whilst discharging at Anchorage the tug is to be within call of the barge at all times to render such reasonable assistance in case of any emergency which might arise. *The tug company is not to be held liable for any damage which might happen to the said barge Bangor or its cargo while in tow or at anchor.*

"4. A round trip is to be considered completed on return of said barge Bangor at western boundary line of United States waters off the southern

entrance to Plumper Sound, and the said sum of net $4,500 shall be paid by the charterers to the tug company on completion of each round trip and before another is commenced."

The amended answer further alleged: That the respondent "with its said tug proceeded with said barge in tow until early in the morning of the 26th day of March, 1917, when, in the neighborhood of Mary Island, in the waters of Southeastern Alaska, and during a heavy wind and snow storm, and without any fault or negligence of any kind on the part of the said tug or those in charge of her navigation, and not on account of any defect in any of the machinery or towing appliances of the said tug, but solely *through the force of said storm and of a defect in the equipment of said barge,* the said barge broke loose from said tug and grounded in the vicinity of the east shore of Mary Island. That all of the damage and injury which was sustained by said barge and her cargo, and by the libelant herein, was a direct and proximate result of the force of said storm and wind and *of the defect in the equipment of said barge,* and for causes *wholly beyond the control of the said tug,* or those in charge of the navigation thereof or of this respondent. That by reason of the terms and conditions of said memorandum of agreement of March 14, 1917, hereinabove set out, and under which said towage services were being performed by said respondent and its said tug, and by reason of the facts herein alleged, and a *lack of any defect in the equipment of said tug,* or any fault or negligence in her navigation, in the absence of any fault or negligence in said tug, her owner, master, or crew, and because of the fault and negligence and lack of proper equipment of the said barge, neither this respondent nor its said tug is liable for or chargeable with any of the damage or injury sustained by the libelant as alleged in the libel."

Both the libelant and claimant introduced an unusually large amount of evidence, resulting in a decree by the court below dismissing the libel at the libelant's cost.

William H. Gorham, of Seattle, Wash., for appellant.
Farrell, Kane & Stratton, of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above).  [1] In support of the decree below the proctors for the appellee insist that, even though the evidence be held to show that the stranding of the barge and the consequent damage was caused by the negligence of the tug, yet its owner cannot be held liable therefor because of that clause of the contract between the parties reading:

"The tug company is not to be held liable for any damage which might happen to the said barge Bangor or its cargo while in tow or at anchor."

The contention of the appellant that there was a contrary verbal agreement cannot be sustained. In view of the record, we regard it as clear that that clause must be taken as appears in the written contract.

But the point also made for the appellant that the tug was not allowed by law to avoid by contract the consequences of its own negligence remains to be considered and determined. This court said in effect that it would not be in the case of Alaska Commercial Co. v. Williams, 128 Fed. 362, 63 C. C. A. 92, citing in support thereof The Steamer Syracuse, 12 Wall. 167, 20 L. Ed. 382, In re Moran (D. C.) 120 Fed. 556, The Somers N. Smith (D. C.) 120 Fed. 569, The M. J. Cummings, (D. C.) 18 Fed. 178, and The Jonty Jenks (D. C.) 54 Fed. 1021. It is

said, however, for the present appellee, that the question was not contested in Alaska Commercial Co. v. Williams, but was decided on the "assumption" that the defendant in error there had correctly stated the law to be that such a contract, exempting such a tug from liability for its own negligence, is contrary to public policy and void.

We are not prepared to accept the correctness of this suggestion, for, while this court held that the contract relied on in the Williams Case was not proved, it gave as a further reason for its judgment in the case that, conceding such contract to have been proven, the towing vessel would still have been liable for the failure of her master to exercise reasonable care and maritime skill in conducting the towage service.

It is not claimed that the decision of the Supreme Court in the Case of the Steamer Syracuse has ever been expressly reversed, or, indeed, criticized by that court; but it is contended in effect that it has been practically reversed, because it denied a petition for a writ of certiorari in the Case of The Oceanica, decided by the Circuit Court of Appeals for the Second Circuit, 170 Fed. 893, 96 C. C. A. 69, in which the majority of that court—one judge dissenting—held that a contract of towage by which the tow assumes all risks releases the tug from liability from her own negligence resulting in injury to the tow; the majority of the court conceding in its opinion on rehearing that its decision to that effect was a departure from previous decisions.

A careful examination of the prevailing opinions in that case we think shows that the decision was really based upon the law prevailing in the state of New York, under which even a common carrier may contract against its own negligence, and such may have been the theory upon which the Supreme Court denied the petition for a writ of certiorari in the case. In Boise Commercial Club v. Oregon Short Line R. Co., 260 Fed. 769, 772, 171 C. C. A. 495, 498, this court said:

"We assume that ordinarily the denial of the writ of certiorari by the Supreme Court may not indicate the expression of an opinion in affirmance of the law of the case as applied by the Circuit Court of Appeals; but where there is a single question involved, and that question is entirely one of jurisdiction, and there have been radically diverse decisions by the lower federal courts, the denial of the writ would fairly imply that the court was satisfied that the jurisdictional point had been rightly decided."

It seems to us that, if the Supreme Court had been dissatisfied with its previous decision in the Case of the Steamer Syracuse, it would have granted the writ of certiorari in the Case of The Oceanica, and have reconsidered the question, and that we would not be justified in regarding its denial of the writ in the last-mentioned case as in effect departing from the rule announced in the Case of The Syracuse which has stood unreversed, and, so far as we are advised, without criticism by it, for so many years—particularly as the case was relied upon in both the prevailing and dissenting opinions in The Oceanica Case, and the further consideration of the question specifically requested in the following concluding clause of the opinion of the majority of the Court of Appeals on rehearing:

"We do appreciate keenly that the decision of the majority of the court as to the right of a tug to contract against her own negligence is a departure

from previous decisions. The question should, and we hope will, be set at rest * * * by the Supreme Court."

But the appellant insists that, even if the attempted limitation of the liability of the tug contained in the contract be valid, the latter was based upon a warranty of the seaworthiness of the tug, which it is contended did not exist, for the reason that, immediately prior to and at the time of the making of the contract and throughout the towage service, the tug lacked a sufficient complement of men to enable it to station a lookout upon it at any time during the voyage, and that because of the lack of a proper lookout the disaster occurred. In the towage case of The Lady Pike, 21 Wall. 1, 22 L. Ed. 499, the Supreme Court said:

"Standard authorities show that the first duty of the carrier, and one that is *implied by law*, is to provide a seaworthy vessel, well furnished with proper motive power and furniture necessary for the voyage. Necessary equipment is as requisite as that the hull of the vessel should be staunch and strong, and she must also be provided with a crew adequate in number and competent for their duty with reference to all the exigencies of the intended route, and with a competent and skillful master, of sound judgment and discretion, and with sufficient knowledge of the route and experience in navigation to be able to perform in a proper manner all the ordinary duties required of him as master of the vessel. Owners of vessels, employed as such carriers, must see to it that the master is qualified for his situation, as they are responsible for his want of skill and knowledge in that behalf and for his negligence and bad seamanship."

In the Pacific Mail S. S. Co. Case, 130 Fed. 76, 82, 64 C. C. A. 410, 416 (69 L. R. A. 71), this court held it to be the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but that they must also provide the vessel with a crew adequate in number and competent for their duty with reference to all the exigencies of the intended voyage, "not merely competent for the ordinary duties of an uneventful voyage, but for any exigency that is likely to happen, such, for example, as unfortunately did happen in the present case—the striking of the ship on a reef of rocks —and the consequent imperative necessity for instant action to save the lives of passengers and crew."

[2] In Wilder's S. S. Co. v. Low, 112 Fed. 161, 172, 50 C. C. A. 473, 484, we also said:

"For an officer to leave his vessel entirely without a lookout, especially when another vessel is known to be in the vicinity, is culpable negligence, and approaches very nearly the line of reckless navigation. The importance of the lookout and the high degree of vigilance required of the person occupying that position on a vessel, is clearly stated by the United States Supreme Court in The Ariadne, 13 Wall. 475, 478, 20 L. Ed. 542, 543, as follows: 'The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel, with all the property and the lives of all on board. The same consequence may ensue to the vessel with which his shall collide. In the performance of this duty the law requires indefatigable care and sleepless vigilance. * * * It is the duty of all courts charged with the administration of this branch of our jurisprudence to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of nonperformance, should be resolved against the vessel sought to be inculpated

until she vindicates herself by testimony conclusive to the contrary.' No deviation from this statement has been made by the Supreme Court in later cases (The Oregon, 158 U. S. 186, 193, 15 Sup. Ct. 804, 39 L. Ed. 943), and it is therefore as binding to-day as when first made."

See, also, The Caledonia, 157 U. S. 124, 130, 15 Sup. Ct. 537, 39 L. Ed. 644; The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 38 L. Ed. 688; The Queen (D. C.) 78 Fed. 155; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 94 Fed. 180, 36 C. C. A. 135; The Drill Boat No. 4 (D. C.) 233 Fed. 589, 594; 35 Cyc. 245.

According to the uncontroverted testimony of the captain of the tug in the present case, its crew consisted of two engineers, two firemen, and two coal passers, all of whom were confined entirely to the engine department, one cook, whose duties were confined to the galley, one deck hand, whose duties were to walk around the deck all day and sleep at night "unless called for something," and two other deck hands, whose duties were to stand watch and watch as helmsmen— the other three men on the tug being the captain thereof (Johnson), one mate, named Dawe, and Capt. Bjerre, who, according to the testimony of the captain of the tug, was "shore skipper," and "don't make trips like" the one in question, but was on that voyage entered on the articles as "purser" and acted as "pilot."

The captain of the tug, on direct examination by the proctor for the libelant, was questioned, and answered, as follows:

"Q. Do you remember the night that the barge broke adrift off of Mary Island? A. Yes. Q. Who was on watch—what members of your crew were on watch that night after 12 o'clock? A. Capt. Bjerre, Sam Dawe, and myself. Q. Did you have a man in the wheel house? A. Quartermaster or deck hand. Q. You had a man in the engine room? A. Yes. Q. Did you have a lookout? A. Well, we were all on the lookout. A. I asked if you had a lookout? A. Yes. Q. What lookout did you have? A. The three of us in the wheel room. Q. And that is all? A. That is all. Q. You had no lookout between the wheelhouse and the stem of the vessel? A. No."

And on cross-examination that witness was questioned, and answered, as follows:

"Q. How far is the wheelhouse from the stem of the vessel on the Commodore? A. Forty feet. Q. How high is the floor of the wheelhouse above the bow of the vessel on a straight line? A. About 12 feet, I should think. Q. Is there any obstruction between the wheelhouse and the stem of the vessel? A. No. Q. Is there anything to obscure the sight or prevent sound? A. Nothing at all. Q. Across the bow. That night, from 11:19 until the barge stranded—until the shackle broke—were the windows of the pilot house open? A. Yes. Q. Where were you stationed? A. Stationed looking out through the window; we had the window open, and we were laying out through there? Q. Laying out? A. Laying out. Q. Could you discern objects from the vessel better from the pilot house than from the stem of the vessel? A. Yes. Q. Could you discern objects from the wheelhouse better than from any other portion of the vessel? A. Yes. Q. How about hearing sounds from the wheelhouse as compared with hearing them from the stem of the vessel? A. Hear much better."

Croft was the deck hand who was on watch at the time of the accident. Being questioned what were his duties, he answered:

"My duties—we have to do everything, you know; when you are a deck hand, you do everything; we have a watch, and have to steer the vessel, the

same as a quartermaster.  Q. Helmsman?  A. Yes; when you ship as a quartermaster, you don't have to do any other kind of work; when you ship as a deck hand, you have to do all kinds of work.  Q. Did you act as helmsman on that voyage?  A. Yes.  Q. Every day?  A. Yes."

As said by the court below in its opinion, this tug, with its tow, was—

"to go through the waters of Southeastern Alaska, themselves none too easy, up through the Gulf of Alaska, one of the most turbulent stretches of water in the world, out into the ocean, and up into Cook's Inlet, at the spring equinox."

The record shows that when the vessels passed Port Simpson the weather was squally, the wind being about 25 to 30 miles an hour, after which they passed Tree Point—that being the last point passed before the wreck at Mary Island, a distance of about 17½ or 18 miles from Tree Point.  During that run the wind increased to about 30 miles an hour, with frequent snow squalls; the night being dark.  Smoke obscured the vision of those in the tug's pilot house from Tree Point to 1 o'clock to some extent, and did not wholly disappear at any time before the accident; this, according to the testimony of her captain.

[3] It is conceded that the tug did not have at the time of the disaster, nor, indeed, at any time, a lookout stationed forward; but the contention of the claimant is that the men in the pilot house of the tug were all lookouts, and had a better vision than would have had a man stationed at the stem of the tug.  The claimant furthermore contends that it was not customary for such tugs to have any lookout stationed forward, and the court below held that the preponderance of the testimony was to the latter effect.

The testimony was certainly conflicting upon the point; Capt. Johnson and Bjerre testifying that the proper place for such lookout was in the pilot house, and the witnesses Neilsen and Snoddy testifying in effect that the proper place was on the forecastle head.  But, regardless of the question of the preponderance of evidence on the point, we think it clear that custom counts for nothing as against the law.  See authorities supra, and The Catharine v. Dickinson et al., 17 How. 170, 177 (15 L. Ed. 233), where the Supreme Court, referring to the evidence given to prove such a custom, said:

"However this may be in the daytime, we think that such custom or usage cannot be permitted as an excuse for dispensing with a proper lookout while navigating in the night, especially on waters frequented by other vessels. Under such circumstances, a competent lookout, stationed upon a quarter of the vessel affording the best opportunity to see at a distance those meeting her, is indispensable to safe navigation, and the neglect is chargeable as a fault in the navigation."

But even if it be conceded that a man stationed in the pilot house of the tug, charged with the duty of keeping a lookout, would answer the requirements, the evidence in the case clearly shows, in our opinion, that neither of the men in the pilot house of this tug during the time in question constituted such a lookout; for one of the men was the helmsman, whose duty it was to watch the compass and steer the vessel under orders given him, and the other two were Capts. John-

son and Bjerre, who, when both were present, were part of the time examining the chart and engaged in conversation; it further appearing that at the time the dangerous situation was discovered and for a considerable period immediately preceding Capt. Johnson was not in the pilot house, but in some other part of the vessel. It cannot be properly held that before Capt. Bjerre, who was at the time directing the movement of the tug, saw the waves breaking upon the island, and suddenly, without any warning to the tow, ordered the wheel put hard over, thereby breaking the tow's shackle, and resulting in its being grounded, a lookout properly stationed would not have seen and reported the island ahead in ample time to have afforded the tug an opportunity to make a safe turn with the tow following. We entertain no doubt that under the law, applied to the existing conditions, the absence of a man to serve as a lookout was the absence of an essential part of the proper equipment of the tug, and rendered it to that extent unseaworthy.

[4] Moreover, we think it was gross negligence on the part of its directing officer—without giving any warning whatever to the tow—to suddenly order the wheel put hard over, resulting, as the evidence clearly shows, in a jerk that broke the tow's shackle, thereby causing her to drift, and resulting in her wreck upon the shore of the island. Had any notice of the intended change in the tug's course been given the tow, an opportunity for a corresponding change in the course of the latter would have been afforded, and the sudden jerk that broke the shackle of the tug have been lessened, and the break very likely avoided.

Regarding the shackle the court below said in its opinion:

"The shackle in question was purchased by libelant about 10 months before the accident; *whether it was new or secondhand when purchased by him does not appear*. How much, if any, usage it had been subjected to before its purchase by libelant does not appear. It does appear, however, that it had been used on this barge as an appliance for towing for a distance of about 10,500 miles—three trips from Seattle to Anchorage and return, and also the trip from Seattle to the place of the wreck. Several shipmasters give instances of shackles breaking without other apparent cause than crystallization resulting from long usage, and instances of other shackles breaking under strains in loads which they had a short time before borne with the greatest of ease.

"Now, this shackle showed crystallization. Avis, the expert for libelant, says that crystallization comes only from sudden severe shock, and that the shackle in question 'was broken by a stress very suddenly applied, which undoubtedly would have broken a shackle made from a much larger bar'; but Tinkham and Lingerfelt, experts for the claimant, deny this, testifying that 'the vibration which comes from much usage will in the course of time cause the iron in the shackle to become weakened by crystallization, and they are also of the opinion that the vibration of the aforesaid trips might have been sufficient to have caused the crystallization. It is in evidence that the tug in the case at bar carried and had in use a towing machine of the most approved pattern, a device designed and effective for the elimination of those sudden jerks of the towline which are caused by the sudden taking up of the slack when turns are made. * * *

"The shackle was part of the equipment of the barge furnished by the libelant. The latter at least contracted that the appliances furnished by him should be suitable and strong enough for all strains to which it was not unreasonable to expect it would or might be subjected. The tug escaped, and

if the barge had followed the tug it would have escaped. It did not follow the tug, because the shackle broke. The shackle broke, because it was not strong enough to stand the strain. I am satisfied from the evidence that negligence cannot be ascribed to the tug for its action or nonaction at or about the time the shackle did break."

The underscoring by the court below of the clause to the effect that it did not appear from the evidence whether the shackle "was new or secondhand" when purchased by the libelant would seem to indicate that the court concluded that the breaking of the shackle by the sudden and abrupt turn of the tug might likely have been occasioned by its secondhand condition when purchased by the libelant. But such was not the evidence. The substance of the only testimony upon the subject that has been cited or that we have been able to find is that the shackle was new when purchased by the libelant from a ship chandler on the water front in Seattle, and the witness Foster, who was supercargo on the barge, and according to his testimony had been a master mariner for about 25 years, and who testified that the barge itself and its equipment was at the time in question of the best, being asked specifically regarding the shackle, was questioned, and answered, among other things, as follows:

"Q. What was the condition of that shackle in respect to being of sufficient size as a part of the towing device for that voyage? A. I couldn't see where it could be in any place better, by previous work we done with it; the shackle was all right. Q. How long had you used that shackle before this voyage in question? A. Oh, we made two or three trips with it. Q. To where? A. Anchorage. Q. From where? A. Seattle, and the west coast of Port Simpson. Q. The same shackle? A. Yes, sir."

The evidence showing that the shackle was new when bought by the libelant, was of sufficient size, had been used successfully in several similar voyages to Alaska, and had stood the strain of the towing here in question in squally weather up to the very point where the unusual strain was put upon it by the sudden jerk of the tug, caused by its abrupt turn without any warning or opportunity given the tow to meet such strain by a conforming change in its course, leaves, in our opinion, no ground for any other conclusion than that the break would not have occurred but for the negligent navigation of the tug.

There remains only to consider the amount of damages sustained by the libelant that he is entitled to recover. On that point the contention of the appellant is that he is entitled to a decree for the aggregate amount of $33,521.47 (with interest and costs) shown in a tabulated statement introduced in evidence as Exhibit R.

We are of the opinion that the evidence in the case is not sufficient to enable us to fix definitely the amount of damages for which the libelant is entitled to judgment. For example, it is claimed on behalf of the appellant that in determining the value of the barge at the time of her stranding the court "will take judicial notice of the enormous universal increase in value of all kinds of craft," growing out of the then war conditions, and likewise in determining the amount of demurrage to which the libelant is entitled. It is obvious, we think, that satisfactory evidence on all such questions is essential to the entry of a proper judgment.

Accordingly the decree appealed from is reversed, and the case remanded to the court below for further proceedings in accordance with the views above expressed, and with leave to the respective parties to introduce further evidence on the question of damages.