### HINE et al. v. NEW YORK & BERMUDEZ CO.

(District Court, S. D. New York. April 9, 1895.)

CHARTER PARTY—ASPHALT—FITTINGS INSUFFICIENT—PORT OF REFUGE— NO GENERAL AVERAGE—HARTER ACT—EXPRESS CONTRACT

    A charter of the S. D. to bring asphalt to New York provided that the ship should be "fitted with shifting boards and bulkheads suitable for carrying asphalt cargo safely, to be done by owner's agents, but at charterer's expense"; after loading at Guanaco, the ship on the first day out took a list, and she then put in to Port of Spain where the list increased, and on the third day the forward bulkhead and fittings gave way, which necessitated unloading, stowage, and refitting and reloading before the vessel could proceed. On the evidence, it being found that this expense and the delay thereby caused arose from the insufficiency of the bulkhead and fittings: *Held* (1) that the providing of a suitable bulkhead and fittings was under the charter one of the owner's duties and risks, though at charterer's expense; (2) that the owners could not recover charter hire or a general average expense for the delay and costs at Port of Spain; (3) that though the owner's agents used "due diligence" in directing the master to shipwrights of high repute, who made the bulkhead, the Harter act was inapplicable; because that act does not interfere with the liberty of contract, as respects matters not within its prohibition.

This was a libel by Wilfrid Hine and others against the New York & Bermudez Company to recover charter hire of the steamship San Domingo, together with certain port of refuge expenses, and for detention during the voyage.

Convers & Kirlin, for libelants.
George A. Black, for respondents.

BROWN, District Judge. The above libel was filed by the owners of the steamship San Domingo against the charterers of the vessel to recover $3,912.37 charter hire, and $11,803.24 for port of refuge

expenses, and for detention of the vessel at Port of Spain, Trinidad, upon a voyage with a cargo of asphalt from Guanaco to New York in September and October, 1892.

The charter was for a period of two months, and provided that the vessel should be tight, stanch, and in every way fitted for the service; that the owners should maintain the vessel in a thoroughly efficient state in hull and machinery for the service, and that the steamer should be "fitted with shifting boards and bulkheads suitable for carrying asphalt cargo safely, to be done by the owners' agents, but at charterers' expense; that the captain should be under the orders and direction of the charterers, as regards employ-ment; that in the event of loss of time * * * or damage preventing the working of the vessel for more than 24 running hours, the payment of hire shall cease until she be again in an efficient state to resume her service; and should the vessel be driven into port * * * from any accident to cargo, such detention or loss of time shall be at the charterers' risk and expense."

The cargo of asphalt was loaded at Guanaco, where the weather was warm; and on the first day out, probably through the melting of the asphalt and some overflow towards the starboard side, the vessel took a list to starboard, which increased on the second day, while she lay in the harbor of Port of Spain. On the morning of the third day it was found that the fittings had been carried away, and the forward bulkhead burst through, from the pressure of cargo against them, so that it became necessary to beach the vessel, discharge and store her cargo, and put up new fittings, in order to complete the voyage. The expenses thus incurred, and the hire of the vessel during her detention in Port of Spain, form the subject of this controversy.

The libelants contend that the fittings were at the charterers' risk; and that the extra charges occasioned by their giving way should, therefore, be borne by the charterers, or else placed to account of general average, as caused by an unexpected sea peril. The respondent contends that all these expenses, as well as the detention, were caused through the insufficiency of the fittings of the vessel for the service; and that under the express provisions of the charter, the owners were legally responsible for the sufficiency of the fittings; and that the latter have no claim, therefore, either for the detention of the vessel or even for any contribution in general average, as against the respondent, for the expenses of discharging, reloading, etc., at Port of Spain.

Upon consideration of the evidence as regards the shifting boards and bulkhead, I feel constrained to find that the cause of the loss was the insufficiency of the fittings and bulkhead for the asphalt cargo designed to be taken on board and subsequently taken; and that no such difference is established between the asphalt loaded, and the kind of asphalt which the owners were entitled to expect would be taken on board at Guanaco, as to absolve the owners from responsibility for this insufficiency.

In behalf of the libelants, it is earnestly contended that the clause in the charter providing that the fittings were "to be done by own-

ers' agents at charterers' expense," was designed only to enable the charterers to avail themselves of the superior knowledge of the owners' agents in preparing the vessel for the service; that the provision that the work was to be at the charterers' expense, shows that this was not for the owners' benefit, and was not expected to be done by the owners at all; and that the reference to the owners' agents indicates that these agents were to act in the matter personally, as the agents of the charterers, and not as the representatives of the owners, or so as to bind the owners by their acts, or omissions in this regard.

Notwithstanding the ingenious arguments of the libelants' counsel, I do not feel justified in adopting this construction. The clause in question was a substantial and necessary part of the charter. The nature of the cargo, a peculiar one, is not elsewhere referred to. Special fittings for such a cargo were necessary to be made by some one; and as the clause in question is made a part of the charter itself, I feel bound to construe it in connection with the previous clause, providing that the ship shall be "in every way fitted for the service" and as an amplification, and further specification of what the service was expected to be, and what was necessary to make the ship fit. The provision that the expense of the fittings should be borne by the charterers, was but a mode of fixing the terms and consideration to be paid by the charterers for the use of the vessel; and I must hold, therefore, that the requirement that fittings "suitable for carrying asphalt cargo safely" should be done by the owners' agents, was a part of the owners' engagement under the charter, and placed upon them the responsibility for the sufficiency of the fittings.

I do not think there was any such acceptance of the fittings as sufficient by the respondents' representative, Capt. Cann, in Guanaco, as to absolve the libelants. Capt. Cann objected to the sufficiency of the fittings on the arrival of the vessel, and suggested additional supports, which were accordingly put in by the captain. But I judge that the principal cause of the subsequent trouble was the bursting of the bulkhead, which may have been due either to insufficient supports, or to weak and brittle material, some of which, consisting of hemlock, the evidence shows was undoubtedly used in the construction. Of the latter fact neither the respondents nor their representatives were aware.

Inasmuch as the damage in question was the immediate result of the failure of the ship to perform her own charter obligations, the clauses in the charter imposing on the charterer the cost of detention are inapplicable; and for the same reason no claim for a general average contribution can be sustained; since it was the fault of the ship that brought about the situation in which the alleged general average expenses were incurred. The Ontario, 37 Fed. 222, and cases there cited; The Energia, 61 Fed. 222, 224.

I do not think that the provisions of the Harter act (Feb. 13, 1893) apply on facts such as I have found. Neither the owners nor indeed the owners' agents in this port were chargeable with any personal negligence, the vessel having been accepted in Philadel-

phia, and the duty of the owners' agents personally having been fully performed by directing the master of the ship to persons in Philadelphia in good repute there and with large experience in building bulkheads.

It is immaterial, however, how it happened that the fittings were insufficient, so long as the respondents did not relieve the libelants of their contractual obligation under the charter, as I find that they did not. The Harter act does not interfere with the liberty of contract in regard to the proper fitting of the vessel for the voyage, or with any contract the parties may make as respects the responsibility for the sufficiency of special fittings, or as regards other matters not within the prohibition of that act; nor was the melting of the asphalt in the warm climate of the port of shipment, any "inherent defect, quality, or vice of the thing carried"; but, on the contrary, it was one of its natural qualities, against which the provisions of the charter stipulation must be deemed intended to provide.

The libel must, therefore, be dismissed, with costs.