HINE et al. v. NEW YORK & BERMUDEZ CO.

(Circuit Court of Appeals, Second Circuit. April 7, 1896.)

1. CONSTRUCTION OF CHARTER PARTY—FITTINGS FOR ASPHALT CARGOES.

A charter party negotiated for the owners by shipbrokers provided for voyages to South America, not south of the river Platte, "including Guanaco, Venezuela," and contained a stipulation, written into the printed form, that the ship was to be fitted "with shifting boards and bulkheads suitable for carrying asphalt cargoes safely, to be done by owners' agents, but at charterers' expense." *Held*, that the description "owners' agents" did not bind the brokers, individually, to make the fittings, in place of the owners, but, on the contrary, imposed on the owners the duty to deliver the vessel suitably fitted, as specified, for asphalt cargoes, they having been notified that such cargoes were to be loaded. 68 Fed. 920, affirmed.

2. SAME—ACQUIESCENCE OF CHARTERERS—INSPECTION AND ACCEPTANCE.

Shifting boards not being permanent structures, a ship may be properly fitted with "suitable shifting boards," if they are on board, though stowed away until the necessity for their use arises; and therefore the fact that charterers, having a right to have the vessel thus fitted, have an opportunity to go aboard and inspect her before delivery and acceptance, does not estop them from afterwards asserting that the vessel was not so fitted.

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel in admiralty by Wilfred Hine and another against the New York & Bermudez Company to recover from the latter, as charterers of the steamship San Domingo, certain expenses incurred at a port of refuge, and charter hire for the period of detention therein. The district court dismissed the libel (68 Fed. 920), and libelants have appealed.

J. Parker Kirlin, for appellants.

Geo. A. Black, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The libelants are owners of the steamship San Domingo. They engaged the firm of Bowring & Archibald, shipbrokers in New York City, to effect a time charter of their vessel. Negotiations ensued between this firm and W. H. Hurlbut & Co., representing the respondents, which resulted in a charter executed by Bowring & Archibald, agents for owners, and by the New York & Bermudez Company, through its president. The material parts of the charter party are as follows:

"The said agents agree to let, and the said charterers agree to hire, the said steamship for a trip of about two calendar months from the day of delivery * * * in New York, * * * she being then stanch, strong, and every way fitted for the service, * * * and to be so maintained during the continuation of this charter party; to be employed in such lawful trades, between safe port $^{and}_{or}$ ports in British North America (not north of River St. Lawrence) $^{and}_{or}$ United States of America $^{and}_{or}$ West Indies $^{and}_{or}$ South America (not south of River Platte), *including Guanaco, Venezuela,* as charterers or their agents shall direct."

All of this clause was a part of the printed form used, except the words italicized. The words, "South America (not south of River Platte)," were broad enough, by themselves, to include any port in Venezuela. The insertion, therefore, of the words, "including Guanaco, Venezuela," was a distinct, positive, and explicit notice to the owners that their vessel was being chartered for use in trade with that port, and was to be stanch, strong, and in every way fitted for such service as employment in that trade would require of her.

Next follows a clause providing for payment by owners of wages, provisions, and stores. This is followed by a provision requiring charterers to pay for coals, port charges, etc.,—both clauses being part of the printed form. Then comes the clause which, by reason of the careless and inartificial way in which it was expressed, has caused the litigation now before this court for determination. It is in ink, containing provisions not contemplated by the printed form, and reads as follows:

"Steamer to be fitted with shifting boards and bulkheads suitable for carrying asphalt cargoes safely, to be done by owner's agents, but at charterers' expense."

It will be noticed first that this clause clearly and explicitly notified the owners that, at whatever of the stipulated ports the charterers found asphalt, it might be expected they would load the vessel with it. The clause also contemplates that something shall be done to the ship in order to fit her for carrying such cargoes. The owners contend that this fitting is to be done by the charterers, and, in support of this contention, call attention to the circumstance that the clause is written under the same subdivision in the charter party which contains the provisions as to charterers paying for coals, port charges, etc. Inspection of the original document, however, shows that this argument is wholly without force. The clerk who undertook to fill up the printed form evidently wrote the clause in the first blank space he found large enough to contain it. Alternatively, the owners contend that it was to be done by Bowring & Archibald individually; the words "owners' agents" being, as they contend, mere descriptio personæ, and used for the purpose of identifying that firm. This would be a most strained and unnatural construction. The charter party is a bipartite agreement. The construction contended for would introduce a third party, individually responsible for defaults in the performance of acts for the doing of which it received no consideration. Evidence was introduced by the libelants explanatory of the situation of the parties, and which discloses the negotiations that led up to the making of the charter party. When the charter was first talked of, Guanaco was not referred to. It was subsequently named as one of the ports. Asphalt was spoken of as probable cargo, and, when the parties had about got to terms as to rate of hire, charterers wished the owners to pay the expense of putting in the fittings necessary for that sort of cargo. Bowring & Archibald, acting as agents for the owners, declined to go to this expense, whereupon the charterers agreed to pay it, but still expressed a desire to have the fittings put up, or their putting up seen to, by Bowring & Archibald. There seems to have been some impression that Bowring & Archibald's long experience as steamship owners and agents would tend to insure the work being done properly. But all this in no way operates to require an unnatural construction of the clause. A phrase which states that a certain piece of work is to be done by "owners' agents" plainly imports that it will be done by agents of the owners, not by agents of the charterers. That the charterer is to pay the expense entailed does not change the provision for doing the work; and if the particular agents who represent the owners have superior knowledge and experience, and may be expected to use superior judgment in prescribing the details of the work, that knowledge and experience may presumably benefit the owners, but will not relieve them of the obligation to do the work which they have stipulated shall be done by their agents. We concur, therefore, in the conclusion expressed by the district judge, as follows:

"The clause in question was a substantial and necessary part of the charter. The nature of the cargo—a peculiar one—is not elsewhere referred to. Special fittings for such a cargo were necessary to be made by some one;

and, as the clause in question is made a part of the charter itself, I feel bound to construe it in connection with the previous clause, providing that the ship 'shall be in every way fitted for the service,' and as an amplification and further specification of what the service was expected to be, and what was necessary to make the ship fit."

The charter party, therefore, when executed by owners' agents, bound their principals, the owners, when notified that an asphalt cargo was to be loaded, to deliver the San Domingo "tight, stanch, strong, and in every way fitted for" such service, "with shifting boards and bulkheads suitable for carrying asphalt cargoes safely." Apparently, this stipulation was entered into by owners' agents without any consultation with their principals. It was, however, within their authority, as shipbrokers and agents for the owners, to make such stipulation. It was, moreover, reasonably to be expected that having, as agents, thus increased their principal's obligations beyond the measure expressed in the usual printed form of charter party, they would continue to act as agents for owners, in complying with such special stipulation. In other words, having pledged the ship to a warranty of the seaworthiness of additional fittings to be put in by them, it might fairly be supposed that they would personally superintend the doing of the work, thus giving their principals the benefit of the special knowledge and experience they were supposed to possess. The contrary seems to have been the case. Having negotiated the charter, executed the charter party on behalf of owners, and thus, presumably, earned their commissions, they turned the business of fitting up the San Domingo to safely carry asphalt cargoes over to the captain, who had never had any experience with such cargoes. The San Domingo being in Philadelphia, Bowring & Archibald sent for the captain to come to New York, for consultation with the charterers. Upon his arrival they sent him with a clerk to the charterer's office. There he received some general instructions, but none as to shifting boards, or the kind of bulkheads needful to keep the asphalt from shifting. He returned to his ship, in Philadelphia, and, agreeably to the advice of Bowring & Archibald, consulted L. Westergaard & Co., steamship agents in Philadelphia, as to the best man for doing the fitting up, and, on the latter's advice, employed a firm of ship carpenters to do the work. The carpenter to whom the work was intrusted did not know how many tons of asphalt the vessel was going to carry. He had never fitted up a vessel for asphalt, and made no inquiries as to what fittings were necessary for such a cargo. The captain, who understood that asphalt was about like pitch, informed him that the cargo was a nasty one to carry, that it would run, and that the bulkhead had to be made extra strong. The carpenters lined the ship's sides with plank, to protect it against the sticky contact of the asphalt. They also took down the cross bulkhead already in the fore hold of the ship, and rebuilt the same so as to enlarge the temporary coal bunker between that bulkhead and the engine room. No other work was done, no shifting boards placed, nor any prepared and put on board; and in this condition the vessel was delivered to charterers, and sailed from Philadelphia to take her cargo of as-

phalt at Guanaco. "Shifting boards" are temporary partitions dividing the hold or holds, in which they are placed fore and aft. Their thickness and strength naturally vary with the cargo they are intended for. Their object is to prevent cargo in bulk from shifting from one side to the other, thus producing a list which, unless checked, will itself induce still more cargo to shift to the downward side. The evidence shows conclusively that, in order to carry Guanaco asphalt safely, such fore and aft division of the hold in which it is carried is absolutely essential. It is softer than Trinidad asphalt, and when dumped into a vessel's hold, in the climate of Guanaco, it soon gets into about the consistency of thin dough, runs together, and finds its level. There is some evidence to the effect that shifting boards are not needed with Trinidad asphalt, and it is argued that since the usual commercial asphalt comes from Trinidad, provision for safely carrying asphalt does not necessarily require shifting boards. The difficulty with this suggestion, however, is that the charter party expressly calls for shifting boards. The ship carpenter who was recommended by the firm in Philadelphia as "the best man for doing this fitting up" put in no shifting boards, because no one instructed him to. The firm in Philadelphia whom Bowring & Archibald instructed the captain to consult with did all they undertook when they recommended the ship carpenter. The captain did not direct the carpenters to provide shifting boards, because, although he had a copy of the charter party in his possession, he never read it until after he sailed from Philadelphia for Guanaco. Bowring & Archibald, the owners' agents, who had inserted the clause prescribing the fitting up for asphalt cargoes, and who knew that shifting boards were to be part of such fittings, did not see that they were provided before delivery of the vessel, for the reason, apparently, that after they had closed the contract they gave no further attention to carrying it out. If they had supervised the work which the contract specified should be done by "owners' agents," they surely could not have failed to provide the shifting boards they had agreed should be provided; and since, in our opinion, the catastrophe would not have happened, had the vessel been provided with a complete set of sufficient shifting boards, the loss in this case is undoubtedly due to the failure of the owners' agents to carry out the terms of the stipulation which they pledged their principals to carry out.

The San Domingo sailed in due course for Port of Spain, where she was to touch and report to charterer's agent, and thence to Guanaco. Having by this time read the charter party, the captain, on the voyage down, put up shifting boards fore and aft in the forward hold, and shored or braced them up, where needed, against the ship's sides. The timber used was such as he had aboard; part of it being a temporary between-decks, which was laid when carrying fruit. In the after hold there was a tunnel shaft rising about seven feet high from the bottom of the ship, which, for that distance, sufficiently answered the purpose of a fore and aft partition. No shifting boards were placed immediately above this tunnel, and

in fact there was not sufficient timber on board available for the purpose, nor could any be procured ashore. After the asphalt had been loaded into the after hold to a height of some two feet above the top of this tunnel shaft, some shifting boards—part of which were abstracted from the charterer's agent at Guanaco—were placed in this hold, extending up to the top of the cargo, which rose a little way above the between-deck beams. The vessel sailed in due course from Guanaco. On the first day out she took a list to starboard, which increased on the second day, while she lay in the harbor of Port of Spain. On the morning of the third day it was found that some of the shifting boards in the forward hold had been carried away,—not broken, but lifted out of place,—and that the forward bulkhead on the starboard side was burst through, the asphalt flowing into the temporary coal bunker. The shifting boards in the upper part of the after hold were intact. Without going into further details, it is sufficient to say that the list increased to such a dangerous extent that it became necessary to beach the vessel, discharge and store her cargo, and put up new fittings, in order to complete the voyage. There are three theories to account for the catastrophe. The respondents insist, and the district judge found, that the principal cause was "the bursting of the bulkhead, which may have been due either to insufficient supports, or to weak, brittle material, some of which, consisting of hemlock, the evidence shows, was undoubtedly used in the construction." If this were the cause, the ship would be responsible, for the reason that a structure which her owners had undertaken should be "suitable to safely carry" asphalt cargo had broken down without unusual strain. The second theory is that the vessel having, from some cause or other, a slight list to starboard, the shifting boards in the fore hold gave way, and that the asphalt, flowing to starboard, heaped itself up against the temporary cross bulkhead to such an extent as to subject it to a strain far greater than its builders had any reason to expect. Upon this theory it might be found that the cross bulkhead was sufficiently strong to carry asphalt cargoes safely, but certainly there must have been some defect in the shifting boards, or in the way in which they were put up, for which, since they were part of the fittings required, the ship would be responsible. The third theory is that, under the influence of a slight list to starboard, the semifluid asphalt in the after hold made its way from port to starboard through the space above the tunnel shaft, where there were no shifting boards, and that, as the quantity on the starboard side gradually increased, the list increased likewise, until, by reason of the recession of the asphalt from the starboard side of the shifting boards in the fore hold, and the heaping up of the same upon the port side of those boards, they gave way, whereupon the asphalt heaped up to starboard sufficiently to break through the temporary bulkhead. This theory, which is advanced by appellants, seems to us the most reasonable one. But, even if the damage were caused in this way, the ship is nevertheless responsible. Had she protected the after hold with shifting boards upon the top of the tunnel

shaft, there would have been no place through which the asphalt could have flowed from port to starboard so as to increase the list sufficiently to break down any of the partitions. The reason the ship was unable thus to protect herself against the shifting action of the cargo was the failure to provide her with suitable shifting boards before she sailed from Philadelphia, and for such failure, as has been shown before, the owners are responsible.

"Shifting boards," as the name implies, are not permanent structures; and a ship may properly be said to be fitted with "suitable shifting boards," if they are aboard, although stowed away until the necessity for putting them in place may arise. The circumstance, therefore, that the charterers had a chance to go aboard the ship at Philadelphia, and see her fittings, before delivery was accepted, does not estop them from now insisting that she did not have on board the material which the charter party stipulated she should carry for the purpose of putting up the temporary partitions when required. Nor do we find in the testimony as to the sayings and doings of Capt. Cann, who was the agent for the charterers' asphalt business in Port of Spain and Guanaco, sufficient to excuse the shipowners from carrying out the terms of their written contract. Whatever authority Cann had,—and that is not very clearly shown, —he certainly had none to alter the contract, or waive the obligation of complying with its terms.

When she was in the port of refuge the San Domingo was furnished with a fore and aft bulkhead in the after hold, and a double plank fore and aft bulkhead in the forward hold. These bulkheads, which were required by the surveyors at Port of Spain, were paid for by the owners, and have not been paid for by the charterers. We are inclined to the opinion, from the testimony, that these structures were more elaborate and expensive than the occasion warranted. With such a cargo as this, it is evidently "the first step that costs." Once let a small quantity get over to the wrong side of the ship by an unobstructed path, and the list will continue to increase till nothing but a permanent structure as solid as the ship's side can resist the strain. But the feeble movement of the first installment may, no doubt, be effectually checked by a much slighter obstacle. The catastrophe already experienced, however, had probably made the surveyors overcautious. The claim is made by libelants that the cost of these fittings should be allowed to them. The district judge disallowed the claim, as not within the issues raised by the pleadings. The charterers undoubtedly are chargeable with the necessary expense of supplying sufficient fore and aft partitions, but it does not follow that they are to pay the increased cost of putting up such partitions in a port of refuge. If there were evidence in the case showing what would be a fair and reasonable price for supplying shifting boards suitable for safely transporting asphalt cargoes, in the port of Philadelphia, at the time the vessel was fitted up, we would be inclined to allow libelants to recover that amount, irrespective of the form of their pleading, and thus avoid circuity of action, but there is no such evidence in the case. The decree of the district court is affirmed, with costs.