## THE GEORG DUMOIS.

### (District Court, E. D. New York. June 23, 1898.)

CARRIAGE BY SEA—BANANA CARGO—UNSEAWORTHINESS.

A vessel, chartered, in part, for the transportation of bananas, and employed substantially for that purpose between New York and Port Limon, left the former port on her eleventh trip in such condition that her boilers failed, and she was compelled to put into an intermediate port for repair. This delayed her arrival at Port Limon, and bananas, cut according to a practice theretofore observed in the use of this vessel, in anticipation of her due arrival, were thereby too much ripened for safe shipment and delivery in New York, and were greatly damaged upon arrival at such port. The failure of the boilers resulted from the negligence of the owners, and the deterioration of the bananas was the natural consequence of such negligence.

Ward, Hayden & Satterlee, for claimants.
Black & Kneeland, for libelants.

THOMAS, District Judge. On the 20th day of July, 1895, the libelants, as co-partners, under the firm name of Ellinger Bros., entered into a charter party, for the charter of the steamship Georg Dumois, for six months or more, in case of a renewal, at a price named per month. It was stipulated that the vessel, with her full complement of officers, seamen, engineers, and firemen, should be delivered at Port Limon, "ready to receive cargo, and being tight, staunch, strong, and in every way fitted for the service," which was the carriage of merchandise and passengers between ports in North America and ports in the West Indies, Central America, and South America. The charter party further provided:

"(1) That the owners shall provide and pay for all provisions, wages, and consular shipping and discharging fees of captain, officers, engineers, firemen, and crew; shall pay for the insurance of the vessel; also for all engine room and deck stores; and maintain her in a thoroughly efficient state, in hull and machinery, for and during the services, guarantying to maintain the boilers in a condition to bear the working pressure of at least 60 pounds (and this pressure to be carried continuously) during the whole term of this charter. * * * (4) * * * That the captain shall prosecute his voyages with the utmost dispatch. * * * (7) That, in the event of loss of time from deficiency of men and stores, breakdown of machinery, or damage preventing the working of the steamer for more than twenty-four hours at sea, the payment of hire shall cease until she be again in an efficient state to resume her service; * * * also if any loss of time from crew or stores not being on board in time, or from repairs to hull and machinery, which are for owners' account, not being complete after cargo and coals are on board and hour of sailing has been fixed by charterers, and notice given to captain, the time lost is for the steamer's account. (8) * * * The act of God, the enemies, fire, restraints of princes, rulers, and people, and all other dangers and accidents of the seas, rivers, machinery, boilers, and steam navigation throughout this charter party always excepted. * * * (12) * * * That, on account of the perishable nature of the cargoes that this steamer is intended to carry, she is not allowed to stop to pick up any wreck, or in any way assist or tow any vessel, especially when by so doing she is liable to be detained, only in order to save human life."

The charter party also provided as follows:

"It is understood [that the] steamer is built for banana trade, has steam pipes, side ports, large ventilators, holds lined with charcoal, fruit decks, saloon on deck amidships," etc.

Previous to the voyage involved in this action, the vessel had made 10 trips, under the charter party, between New York and Port Limon, according to a practice whereby she left the former port on Wednesday, arrived at the latter port on Friday of the following week, leaving on her return trip on Saturday, and arriving at New York on Monday or Tuesday morning of the second week following. On Wednesday, July 15, 1896, the vessel left New York. On July 21st two stay bolts, extending between the combustion chamber and the back of the boiler, and intended to prevent a collapse of either, were leaking so that the water came out into the fire room. The chief engineer of the vessel thus describes the situation:

"On the 21st of July the stay bolts gave way. It was hard to keep the water in the boiler after the stay bolts gave way, because there was considerable leak. * * * The bolts did not really break. It was the packing under the washer that gave way, and the thread was so corroded that, when I came to make it up again, there was no thread for the nut. * * *"

The engineer's log was as follows:

"Tuesday, the 21st of July, 1896, sprung a leak in main boiler. The leak increased more and more, so it was impossible to hold the water at its proper level with the feed open. At the same time the high-pressure valve broke, so we were obliged to seek harbor for repairs. The water got lower and lower. The first leak was observed Tuesday morning at 2:30. Proceeded at slow speed to 5:30 afternoon same day, and steam became so low that we could not keep more than 80 pounds. Arrived at Barracoa, Tuesday afternoon, 5:30, to commence repairs."

The engineer also testified:

"Q. After the leak began it kept on increasing till you anchored at Barracoa? A. Yes; it leaked so much that after we hauled the fires there was no water in the glasses. Q. But is it safe to keep the fire under the boiler when the water disappears from the glasses? A. It is not safe. Q. What would happen if that were done? A. There would be an explosion."

The captain testified as follows:

"We left here the 15th, and we had some head wind and head sea coming out for the first two days,—about that,—and we noticed that it was very hard to get up high pressure in the boiler, but we accounted the reason to be bad coals and new firemen, because there were new men. Nothing happened until I had the bearing of the lighthouse in Cuba. Q. What light? A. Cape Maysi; and at 2½ a. m. the engineer came up and told me that the boiler was so leaky that the firemen could hardly stand there and shovel the coal; and I went down there myself, and I just put my feet coming down in this boiling water. The ship was rolling, and this boiling water was, maybe, three inches high, you see; so that we first thought we had to go into Barracoa, but then there came a report that the leak was decreasing. * * * And then the report was again, 'Now it gets worse.'"

The vessel remained at Barracoa until 5 o'clock on the morning of Friday, July 24th, making necessary repairs, and then sailed, arriving at Port Limon at noon on the following Monday, July 27th. While at Port Limon, one or two of the stay bolts, one of them not of those repaired at Barracoa, began to leak; but such bolts were repaired, and the vessel was loaded and ready for sea at 1 o'clock on Tuesday afternoon, July 28th, but was detained by libelants' agent waiting to ascertain whether the cargo could be carried to New Orleans, which it could not be on account of the quarantine. But on Wednesday, July 29th, at 10 a. m., the vessel sailed for New York. Some of the stay bolts leaked on the way to New York, but her passage, in point of time, was somewhat better than the outward time. The length of the voyage from New York to Port Limon was 2 days and 13 hours longer than the longest voyage, and 3 days and 15 hours longer than the shortest voyage, the vessel had previously made between those ports. The period of variation between her longest and shortest voyages was 1 day 2¼ hours. To economize time, the charterers had been in the habit of telegraphing to Port Limon the date of the probable arrival of the steamer there, and thereupon the shippers of bananas would have the green bananas cut and carried down to the wharf so as to be there on the arrival of the vessel, it being necessary that the bananas should be shipped green to prevent their ripening too much on the voyage to New York. That course was pursued in this case, and, on the arrival of the vessel, the bananas, which had been on the pier awaiting her arrival for three days, were not fit to be sent to New York, and

would not stand the trip, of which the libelants were advised by telegraph, and the captain protested that he could not be accountable for them. The libelants increased the delay, as above stated, by some hours, in an effort to ascertain whether the ship could not go to New Orleans, but was finally ordered to New York. Upon the arrival at such port, it was found that a very large part of the bananas was unmarketable. It is for the loss of these bananas, and deterioration in price of the others, that this libel is brought.

The liability of a common carrier of goods does not, primarily, at least, rest on the contract to carry, but is implied by law, having its foundation in the policy of the law, and it is by reason of this legal obligation that a carrier is charged with the loss of, or injury to, property intrusted to it for carriage. Railroad v. Swift, 12 Wall. 262; Merritt v. Earle, 29 N. Y. 115; Carroll v. Railroad Co., 58 N. Y. 126.

Subject to such modifications as have been ingrafted by statute upon the rule, or are lawfully stipulated in charter parties, bills of lading, or other contracts of shipment, persons operating ships and vessels, to the same extent as other common carriers, are liable for the safe custody, safe transport, and right delivery of goods and merchandise which they receive and undertake to transport, loss or injury arising from inevitable accident or irresistible force excepted. The Commander in Chief, 1 Wall. 43, 51; The Lady Pike, 21 Wall. 1; The Niagara v. Cordes, 21 How. 7, 23, 26, 29; Elliott v. Rossell, 10 Johns. 1, 8; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 437, 9 Sup. Ct. 469.

The initial duty of a common carrier by water is to provide a seaworthy vessel, well furnished with proper motive power, and furniture necessary for the journey. Necessary equipment is as requisite as that the hull of the vessel should be staunch and strong. The Lady Pike, 21 Wall. 1, 14; The Niagara v. Cordes, 21 How. 7, 23.

The warranty of the safe carriage and delivery of goods does not extend to the case of delay in delivering them, provided the freight be actually delivered in good condition, for in that case the question is simply one of reasonable diligence (Parsons v. Hardy, 14 Wend. 215; Wibert v. Railroad Co., 12 N. Y. 245, 251; Blackstock v. Railroad, 20 N. Y. 50; Geismer v. Railway Co., 102 N. Y. 563, 7 N. E. 828), unless there be a stipulation for delivery by a time certain, for even inevitable accident or unforeseen contingency will not excuse the fulfillment of such covenant (Harmony v. Bingham, 12 N. Y. 99).

As has been stated, the legal obligation of a carrier may, to some extent, be modified by stipulation, contained either in the form of a charter party, bill of lading, or a contract. In the present case a charter party exists. A charter party is not a demise of the ship itself, as contradistinguished from a right to have goods carried by the vessel (Hagar v. Clark, 78 N. Y. 45), but is a mere affreightment sounding in covenant (Robinson v. Chittenden, 7 Hun, 133). As has been stated, the law places upon the carrier the absolute obligation to make the ship seaworthy at the time of the commencement of the voyage. The Carib Prince, 18 Sup. Ct. 753 (decided May 23, 1898; No. 44, Oct. Term, 1897); The Caledonia, 157 U. S. 124, 15

Sup. Ct. 537. And where the owner of a vessel charters her, there arises, unless the contrary be shown, an implied contract on his part that she is seaworthy and suitable for the service in which she is to be employed. He is therefore bound, unless prevented by perils of the sea or inevitable accident, to keep her in proper repair, and is not excused for any defects, known or unknown. Work v. Leathers, 97 U. S. 379. Such is the implied contract, where no express stipulation appears. Putnam v. Wood, 3 Mass. 481; 3 Kent, Comm. 305. By such charter party, however, the common carrier may exempt himself from his usual obligation, so far as he is insurer of the safe delivery of the goods intrusted to him, but may not exempt himself from liability for injury caused by his negligence. And, on the other hand, the carrier may assume obligations beyond those primarily imposed by law, or other than those which usually pertain to common carriers, or obligations which usually pertain to common carriers, but from the observance of which the statute has released them. Hine v. New York & Bermudez Co., 68 Fed. 920, affirmed 20 C. C. A. 63, 73 Fed. 852; The Silvia, 15 C. C. A. 362, 68 Fed. 230.

The next question is whether there is anything in the present charter party that modifies the obligation implied by law. The failure in the present case is of the motive power. The stay bolts leaked to such an extent that the vessel could not be operated. There was no motive power. She left New York on July 15th, at which time repairs, alleged to have been most thoroughly made, were completed. It is said that, while the boilers were repaired in other respects, the stay bolts were not disturbed, as a most thorough and sufficient inspection indicated no leakage; but, after four days out, no accountable cause intervening, two of the bolts leaked to such an extent as to deprive the vessel of operating power; and, after repairs at Barracoa, she proceeded to Port Limon, where the stay bolts again leaked; and, although these were repaired, there was leakage on the way to New York, and when the stay bolts, 28 in all, were removed after her arrival, it was found that the thread of the bolts was corroded, and that the plates were so impaired where the bolts entered that they were reamed out, and larger bolts necessarily used.

In Dupont De Nemours & Co. v. Vance, 19 How. 162, 167, it is said:

"To constitute seaworthiness of the hull of the vessel in respect to cargo, the hull must be so tight, staunch, and strong as to be competent to resist all ordinary action of the sea, and to prosecute and complete the voyage without damage to the cargo under deck. If a vessel, during the voyage, has leaked so much as to injure the cargo, or render a jettison of it necessary, one mode of testing seaworthiness is to ascertain what defects, occasioning the leakage, were found in the vessel at the end of the voyage, and then to inquire which of those defects are attributable to perils of the seas encountered during the voyage, and which, if any, existed when it was begun; and, if any of the latter be found, the remaining inquiry is whether they were such as to render the vessel incompetent to resist the ordinary attacks of the sea, in the course of a particular voyage, without damage or loss of cargo."

Under such a system of testing the question, the vessel in the case at bar was unseaworthy; and, moreover, it seems evident that such an accident, for which no immediate cause can be given, indi-

cates that the means of inspection employed in New York were imperfect, and that the inspection itself was negligent and insufficient. There is nothing in the charter party that relieves the owners from liability for this condition. As has been shown, suitable motive power is assured, although, in the case at bar, it is apparent that it did not exist, and proper care was not taken to provide it. The first subdivision of the charter party provides that the owners shall "maintain her in a thoroughly efficient state, in hull and machinery, for and during the service." This stipulation certainly does not modify the duty prescribed by law, but reiterates it. However, the stipulation continues: "Guarantying to maintain the boilers in a condition to bear the working pressure of at least sixty pounds (and this pressure to be carried continuously) during the whole term of this charter." When the pressure was 80 pounds, the vessel went into port, because the motive power had failed, and it was necessary to haul the fires for fear of an explosion. Such a provision is not understandable. It conflicts with every term of the charter party, with its purpose, and, if observed, excuses any navigation of the ship, as 60 pounds pressure would not start the engines. The advocates explain that it was a part of an old form, applicable before triple-expansion engines were used, and that the conservatism of those making charter parties is such that this harmful and vain clause has been retained, with the result of confusing, or, if literally applied, avoiding, the contract. It eliminates from the charter party all its life, and is so repugnant to the law and to the spirit and the remaining terms of the charter party that it must be disregarded. The exemption clause does not operate to exculpate the owners for this defect. Subdivision 8 provides that "the act of God, the enemies, fire, restraints of princes, rulers of the people, and all other dangers and accidents of the seas, rivers, machinery, boilers, and steam navigation throughout this charter party always excepted." If the leakage of the boilers was due to their defective condition at the time the voyage commenced, it does not fall within the exception. The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537; The Carib Prince, supra. Moreover, the stipulation does not, and could not, except from liability from causes resulting from the negligence of the owners, and such negligence obviously exists in the present case.

It is contended by the claimant that the third section of the Harter act relieves it from liability, inasmuch as the owners "exercised due diligence to make the said vessel in all respects seaworthy, and the injury to the bananas resulted from their inherent defect, quality, or vice." 27 Stat. 445. However, it does not seem to the court that the owners did exercise due diligence, and, moreover, they seem to have warranted the due maintenance of the machinery in the charter party, as they had a right to do, as above shown.

It must be held that the owners did not fulfill the warranty of seaworthiness, or their duty to use due care, at the time the vessel left New York. If so, for what are they liable? The voyage was made from Port Limon to New York in due time. No act was done, and no omission was suffered, during that time—no defect existed

during that time—that caused the injury. The delay was during the voyage from New York to Port Limon, and it is that delay that, as it is urged, caused the damage and resulted in liability. But during that time the goods were not in the possession of the vessel, nor had they been delivered to it, or to its owners or their agents, actually or constructively. The liability of a common carrier, as such, usually begins when goods are delivered to him, at the place appointed or provided for their reception, in a proper condition and ready for immediate transportation. London & L. Fire Ins. Co. v. Rome, W. & O. R. Co., 144 N. Y. 200, 39 N. E. 79. There is no evidence that the goods had been received by the carrier until the arrival of the vessel at Port Limon, and after that time it acted with due expedition. It is a sufficiently drastic rule that a carrier insures the safe carriage of goods received by it for carriage. In the absence of some contractual duty, this rule should not be extended to goods which the shipper might have earlier delivered to it, if the carrier had not been delayed. In such case the claim would be this: A carrier by sea between A. and B. and return insures that his vessel is seaworthy upon leaving A., and if his ship be unseaworthy, and he be delayed in going to B., he insures the safe delivery, in sound condition, of all goods carried by him from B. to A. This makes him liable for injury to goods in his possession, arising from delay in conveying them, and for goods not in his possession, and not even delivered to him, during such delay. Surely, nothing in this primary law relating to the liability of common carriers justifies such a rule of liability. Carriers by rail operate under such conditions that the law requires carriage within reasonable time, and, if the carriers fix a schedule time of leaving and arrival, such times are presumptively reasonable. But, even in such cases, only reasonable care is required to fulfill the established schedule. 2 Wood, Ry. Law, p. 1174, § 312; Thomas, Neg. p. 307. It certainly cannot be contended that the carrier, by any implication of law, insures against such delay as to such goods so undelivered to it, and, if liable at all, it should be liable only to use ordinary care.

But does the charter party change the obligation? The charter party suggests several considerations not otherwise involved: (1) The owners knew of and stipulated the use of the vessel for the banana trade. (2) The perishable nature of the freight was recognized. (3) The charter party stipulated for the utmost dispatch. (4) The whole time of the vessel was given to the charterers. (5) Under the charter party, a definite practice of going and coming between two fixed ports was inaugurated and observed, except in the case here involved. (6) The custom of cutting the bananas so as to have them ready for the boat on arrival was instituted, recognized, and followed. (7) The owners knew that, if they sent out an unseaworthy vessel, the cargo which it was sent to bring would probably be lost.

It will be observed that the practice of cutting fruit before and in anticipation of the arrival of the ship on a day certain is not shown to be a general custom; and in The Curlew, 5 C. C. A. 386, 55 Fed. 1003, 1005, it is stated that an attempt to show such custom, in an

action very similar to the one at bar, failed. It does appear, however. that such practice was observed by the charterers in the use of the present ship. This is important, inasmuch as the ship was at the disposition of the charterers, and any regulation prescribed and pursued by them in the use of her,—that is, a custom of the charterers' own creation,—subsequent to the charter party, could not, like the general custom, be related to and incorporated in the charter party, for the purpose of construing its obligations. Yet the charter party did contemplate that the ship should go to southern ports and take cargoes of bananas, and that the voyages should be made with the utmost dispatch, and a duty was placed upon the carrier to use some care to have his vessel in a condition to make the voyage with dispatch. Therefore, when the vessel left New York, on July 15th, the carrier knew that she was expected to go with dispatch to Port Limon; that the charterers' agents would be advised of the date of her sailing from New York; and the time occupied on her 10 former trips pointed to the day of her arrival. Hence the charter party, and the acts done under it, entitle the charterers to have the ship sailing from New York, July 15th, in such good condition that she should arrive at Port Limon and take her cargo on Friday of the following week, so far as the exercise of reasonable care could effect this result, and it was the privilege of the charterers to rely on the proper fulfillment of this duty by the carrier, and have his cargo ready.

The claimants' position is that, while the ship was in the service of the charterers and receiving compensation, and while she was due at a certain port by a certain day, yet, as her owners might send her out in such unseaworthy condition that she could not reach the port in such time, the charterers should not prepare perishable cargo until it was known whether the owners' default or negligence would operate to detain the ship. The result of such position is that the charterers must pay for the ship at Port Limon, while she was lying still during the several days lost in collecting cargo; that is, the charterers are paying for time necessary to gather the cargo after the ship's arrival, to protect the owners against their own possible failure to do their duty, and in apprehension that they may not do it. It seems to be a sounder doctrine that, when the ship sails from New York, her departure is notice to the charterers that she is in a condition to make her voyage and arrive in due time, and that her cargo may be prepared for her on the presumption that the owners have fulfilled their duty, and that such preparation of cargo need not be withheld upon the expectation that the owners had not done their duty, and that the ship will break down in consequence.

The position of the claimants is well stated by Mr. Commissioner Taft in The Ceres, hereafter considered:

"That the libelants should either have assumed that there would be a breach of the guaranty by the owners and withheld their bananas from the risk of it, or otherwise have taken the risk upon themselves of the damage in case such breach should occur."

The view prevailing in this opinion gives the charterers the full use of the ship. The opposite view allows her to lie at the dock, at the expense of the charterers, while the cargo is gathered,—a prac-

tice that would be founded solely on the apprehension that the owner, by his own negligence or default, might not have the ship at the port at the time his duty required him to have it lie there; and yet, withal, the question as to whether the damages are the natural result of the owner's default is not readily settled.

In The Curlew, 5 C. C. A. 386, 55 Fed. 1003, Judge Hughes, in a case presenting similar facts, held (1) that the interruption of the outward voyage was without fault of the carrier; and (2) "that the order * * * sent by the appellees to Jamaica, that the bananas could be cut and brought to the place of shipment in advance of the steamer's actual arrival, was imprudent, contrary to the custom of the trade, and was the real cause of the premature decay of the fruit, and of the loss which resulted to them, for which loss the steamer is in no manner responsible." It will be noticed that the ship is there exonerated because not in fault, and because, as stated in the opinion, in no other case was it shown that the bananas were cut in anticipation of the arrival of the ship. The findings in the case at bar are precisely the reverse, viz. there was a breach of the warranty in sending out the ship in an unseaworthy condition, and the owners did not use even reasonable care to make her seaworthy; and in addition, on the previous sailings, the practice had been inaugurated of cutting the bananas previous to the arrival of the ship, and it was well known that it was the intention to observe such practice on this voyage.

The same question arose, but the facts are obscurely presented, in The Ceres, 61 Fed. 701, 19 C. C. A. 243, and 72 Fed. 936. The decision of Judge Brown that there had been a breach of contract obligation to make the stipulated speed, and that the failure to arrive at the port where the bananas were to be taken on board, and where they had been gathered in anticipation of the arrival of the ship in due time, and their consequent premature decay before delivery in New York, made the owners liable for the injury thereby resulting, was affirmed by the circuit court of appeals. Judge Shipman, writing the opinion, states:

"The important question in this part of the case is whether the damages to the cargo can be regarded as the natural consequences of a breach of the contract which were within the contemplation of the parties, or whether the damages, in the event of a breach, must be considered as confined to the increased consumption of coal, loss of time, and that class of damage. If this guaranty had been contained in an ordinary charter party, by which the vessel was to be used for general purposes, the position of the owners would have been sound, and the guaranty would be construed to have reference to the value of the vessel to the charterers, in respect to economy of time, wages, supplies, hire, and the like general particulars which are immediately connected with the ship itself. But the charter party bore upon its face that it was a form for a fruit charter. The owner, by its agent, and the charterers, understood that the vessel was wanted for a particular use, and the warranty of speed had reference to the adaptedness or fitness of the vessel for that use. The charter party was entered into in view of the necessities of speed in the business in which the vessel was to engage, so that the damage to a perishable cargo, which directly occurred from a failure to make the requisite speed, must have naturally been in the mind and contemplation of the owner's agent when the contract was executed."

The opposite view of Judge Wallace will be found in a dissenting opinion, wherein he holds that:

88 F.—35

"The libelants have been awarded damages for a loss which was not such a probable and necessary consequence of a breach of the warranty as may fairly be supposed to have entered into the contemplation of the parties when the contract was made. Such a recovery is not sanctioned by authority. Griffin v. Colver, 16 N. Y. 489; Baldwin v. Telegraph Co., 45 N. Y. 744; Murdock v. Railroad Co., 133 Mass. 15; Pennypacker v. Jones, 106 Pa. St. 237; Howard v. Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500."

In The Giulio, 34 Fed. 909, it appeared that a vessel chartered for a voyage from New York to Gibraltar and Malta, and thence for return cargo back to New York, from Oran, duly arrived and discharged her cargo, and being ordered to Oran, on the north coast of Africa, left Malta, and put into an Italian port, where she remained unnecessarily long, and did not arrive at Oran within due time. As a consequence there was a delay in the delivery of the cargo at New York, and for this delay, resulting in a diminished market value, a recovery was permitted. In the opinion (page 911) the court said:

"The liability of the vessel for the loss of a market during the period of negligent delay, after the goods have been taken on board, has been often decided in the courts of this country. The Success, 7 Blatchf. 551, Fed. Cas. No. 13,586; The City of Dublin, 1 Ben. 46, Fed. Cas. No. 12,094; The Golden Rule, 9 Fed. 334; Page v. Munro, 1 Holmes, 233, Fed. Cas. No. 10,665; Desty, Shipp. & Adm. § 256. I see no reason why the same rule should not be applied, though the delay arose before the cargo was shipped, where the delay was voluntary, and arose in the course of the voyage contracted by the charter, and after it had been entered upon. The charterers assuredly had the right to count upon the ship's proceeding to Oran, pursuant to orders, with reasonable dispatch, as it was her duty to do."

The conclusions of the court in the case at bar, and the authority of the circuit court of appeals, as enunciated in The Ceres, require a decree for the libelants for the damages to the bananas, with costs. Some question was raised as to the libelants' right to recover for these bananas. Should there be any defect in that regard, it can be raised on exception to the commissioner's report.