### DENE S. S. CO., Limited, v. MUNSON et al.

(District Court, S. D. New York. July 18, 1900.)

1. SHIPPING—CONSTRUCTION OF CHARTER—INJURY TO SHIP FROM CARGO OF ASPHALT.

Under a time charter of a steamer to be employed in such lawful trades between ports of the United States and the West Indies or Caribbean Sea as the charterers might direct, the owners warranting her to be "tight, stanch, and strong, and every way fitted for the service," the owner cannot recover from the charterers for injury to the vessel from bringing a cargo of asphalt from Trinidad, which was loaded under direction of the master; for, while such cargo is peculiar and requires special fittings, and subjects the surrounding parts of the vessel to more than the usual lateral pressure when shipped in bulk, it is not only lawful merchandise, but constitutes one of the chief articles of export from the island, and was clearly within the terms of the charter, which placed the risk of the sufficiency of the vessel upon the owner.

2. SAME—INJURY TO CARGO IN LOADING—LIABILITY OF SHIP.

A provision of a charter requiring the charterer to supply the slings for loading cargo is complied with by furnishing the proper rope from which the slings are made, and the vessel is liable for an injury to the cargo in loading caused by improper splicing of the slings by the seamen, who are furnished by the owner.

In Admiralty. Suit against charterers for injury caused to vessel from cargo of asphalt.

Convers & Kirlin, for libelant.

Wheeler & Cortis and Chas. S. Haight, for defendant Munson.

Goodrich, Whitney & Hagen, for defendant Trinidad Shipping & Trading Co.

BROWN, District Judge. The above libel was filed by the owner of the British steamship "Olivedean," of 2,100 tons gross register, to recover for damages to the steamer resulting from the carriage of asphalt in bulk from Trinidad to New York in the spring and summer of 1898.

The steamer was chartered to the defendant Munson for the term of six months, at the rate of £725 per month, to be employed "in such lawful trades" between ports of the United States and the West Indies $^{and}_{or}$ Caribbean Sea $^{and}_{or}$ various other ports named, "as charterers or their agents shall direct." The owners were "to provide and pay for all provisions and wages of officers and crew, pay for insurance on the vessel and for engine room and deck stores, and to maintain her in a thoroughly efficient state in hull and machinery for the service"; the charterers were "to provide and pay for coal and other charges."

By the eleventh clause, the charterers had "the option of subletting the steamer, if required by them."

The steamer was delivered to the charterer Munson on January 24, 1898; but after one voyage for him from Philadelphia to Cuba and back to New York, he executed a subcharter of the steamer on February 16, 1898, pursuant to the option given him, to the Trinidad Shipping & Trading Company, for the term of five months or until the expiration of the original charter, at the rate of £800 per month, the other terms being substantially the same as in the original charter. All the damages claimed in the libel occurred while the steamer was in the employ of the subcharterers, and the latter were accordingly brought in as additional defendants under the fifty-ninth rule, on the petition of Munson, the original defendant.

The Trinidad Shipping & Trading Company has for a number of years past run several steamers, some of them its own, and others chartered, between New York and Trinidad and other West Indian ports. Asphalt in bulk has usually formed the major part of its cargoes from Trinidad, and that is one of the chief and ordinary articles of export from that island. From its waxy, viscous nature, its lateral pressure when carried in bulk is a somewhat severe test of the strength of whatever it presses against. On the first return voyage from Trinidad under the subcharter about 800 tons of asphalt were stowed in the lower hold of No. 2 compartment, and the severe pressure bent the forward bulkhead of that compartment in the middle about 5 inches forward out of line. The cross bulkheads in that compartment were also somewhat sprung. Seven hundred tons of asphalt were also stowed in the lower hold of compartments Nos. 3 and 4, which were not separated. The shaft tunnel running through the middle of these compartments was covered by asphalt, and on the port side the plates of that tunnel were bent in about 4 inches and the riveting injured for about 30 feet of its length, and a number of the angle frames cracked. The repair of this damage, with the detention of the steamer, amounting in all to $1,293.02, forms the principal item of the damages claimed. The respondents were notified of the injury before the next voyage, and that they would be held responsible for the damage and for any future damage arising from the carriage of asphalt without suitable fittings.

Three subsequent voyages were made under the subcharter after the repairs. On each return trip from Trinidad asphalt was stowed in No. 2 hold, but none in Nos. 3 and 4. On the second and third voyages about 1,000 tons were loaded, and on the fourth about 1,100. On

these three last trips no damage was done to the bulkheads after the repair; but a hatch beam was bent, and some other damages are claimed for injuries caused by careless handling.

1. I do not think that the libelant has established any legal claim for the first item of damage. The ship was let for "such lawful trades as the charterers might direct." The West Indies $^{\text{and}}_{\text{or}}$ Upper South American ports were among the ports first named in the charter. Trinidad is an important one of these ports, and the carriage of asphalt was not only a "lawful trade," and asphalt "lawful merchandise," but it was one of the principal ordinary exports of that island. It was, therefore, clearly, within the written contract of the charter; and "for such lawful trades as the charterers might direct," the steamer was warranted to be "tight, stanch and strong and every way fitted for the service." So far, therefore, as the written contract goes, not only was the carriage of asphalt within the right of the charterer or subcharterers, but the risk of the sufficiency of the vessel therefor was upon the owner. The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 38 L. Ed. 688; Hine v. New York & Bermudez Co. (D. C.) 68 Fed. 920.

In negotiating the charter there were no statements or representations of any kind to limit the employment of the vessel to any special business, or otherwise than in any "lawful trade." Mr. Munson was not himself in the asphalt business; but he dealt largely in the subchartering of vessels previously chartered by him, which would itself naturally exclude any limitation of the vessel's employment different from the provision of the written charter. The charter therefore was the entire and only contract between the parties.

The master testifies that he had never before carried asphalt, and that he was ignorant of its peculiar qualities. But the subcharterers were not responsible for that, and there is no intimation in the evidence that they even knew of his ignorance about it. The agents of the °owner who chartered the vessel had sufficient knowledge of asphalt cargoes, and that asphalt and sugar were the ordinary cargoes from Trinidad; and the master had ample means of informing himself on arrival at Trinidad and before loading. There was no misrepresentation or concealment of any kind on the part of the charterer or subcharterers. The stowage and distribution of the asphalt "was arranged," as the master says, "between me and the Trinidad representative." It was put in the two holds "because they would hold the quantity, and the proportions were according to the trim of the ship"; and sugar in bags was put in No. 1 compartment, but not immediately against the bulkhead, "lest it should injure the iron." Had the bags been stowed with dunnage against the bulkhead, the bulkhead might not have been bent. For the mode of stowing the sugar the ship was responsible and not the subcharterers.

No doubt asphalt is a peculiar cargo and requires special fittings. Hine v. New York & Bermudez Co. (D. C.) 68 Fed. 920, 922, 20 C. C. A. 63, 73 Fed. 852, 855. These consist in lining the ship's sides in order to prevent the asphalt from sticking to the ship and to enable proper cleaning of the ship on discharge to be readily made. As this is a duty of the charterers, the custom, as the evidence shows, is that

in charters made specially for the carriage of asphalt, the charterers for their own protection procure a clause to be inserted requiring the owner to provide these fittings at his expense; otherwise the charterer, it would seem, should provide them, though the evidence is quite indecisive on this point. In this case the subcharterers did provide the fittings. It was a mode of performing their own duty to deliver the ship in a proper and reasonably clean condition. This had no bearing, however, on the duty of strengthening bulkheads or the ship's tunnel, which pertain to the sufficiency of the ship herself for the service engaged. Evidence without restriction as to the practice in this regard was taken, though under respondents' objection to its competency. I do not see how a custom, even if it prevailed, could be admitted to supersede the express provision of the charter, and make the charterer, instead of the owner, take the risk of the ship's sufficiency or bear the burden of repairing her weakness. The evidence, however, fails to establish any such custom. At most it shows only that bulkheads and shaft tunnels are sometimes braced or protected, i. e. when thought necessary; but no customary obligation of the charterer is shown to determine for himself the ship's sufficiency, and to shore up the bulkhead and tunnel, or omit to do so at his peril. Some ships require extra strengthening, others do not. This vessel was originally more strongly built than usual, and it is to be inferred that no additional strengthening was thought necessary. Before the lower holds in compartments 3 and 4 were fully loaded, the shaft tunnel was found to be bending in. It was at once shored up inside by the engineer, carpenter and subcharterers' representative. The master says he was not informed of this until after the loading was completed. This is scarcely credible; but if true, it must have been through his absence or fault. The shaft was strengthened, it must be inferred, so far as thought necessary; since not only was no removal of the asphalt asked for, but the residue of the loading was afterwards completed without objection. And this is further presumptive evidence that no strengthening of the main bulkhead was deemed necessary; since there was still opportunity to shore it up if desired. It was not until after the first trip was made and further damage found done, that asphalt was objected to, and a demand made that the charterer and subcharterers should strengthen the ship at their peril. But as I have said, I do not find any ground for this demand in the contract, or in the evidence. The libel states no such obligation, either by contract, by custom, or by legal duty; but only that asphalt was not ordinary cargo. The employment of the vessel, however, was not restricted to ordinary merchandise, but to lawful trades, i. e. lawful merchandise. To exclude asphalt, that should have been excepted in the charter. I have no doubt that in truth the bulkheads and tunnel were deteriorated and weakened through age, beyond the knowledge or the supposition of the master. The ship was 17 years old, and these had never been renewed. The repair after the first trip was not made, according to the testimony, with any reference to special strengthening for carrying asphalt. Yet on each of the three succeeding trips from 1,000 to 1,100 tons were stowed in compartment No. 2 without damage to the bulkhead; whereas on the first trip only

800 tons had been stowed there. The fair inference is that the bulkhead during these 17 years had become more deteriorated and weakened than was supposed.

2. The claim for similar damage to the hatch beam on the second trip, is disallowed for the same reason, and also because it was suffered to remain after its removal had been suggested by the defendants' representative.

3. The claim of $60.90 for one-half of winchman's overtime is admitted, and I think the damage to the winch rail and ladder by negligence to the amount of $60.50, is also established.

4. A claim of $151.35 is made for expenses of the proper cleaning of the ship after August 1st, and of $293.02 for detention of the ship after that date. The last item must be disallowed. The charter had expired; the intention to surrender the vessel on August 1st was fully known. The owners had her put upon the dry dock on that day for repairs and to have her bottom cleaned and scraped for a new charter; and from that time they had full possession and control of her. The master indeed stated that he should refuse to accept the vessel from the charterers until she was further cleaned, and the damages to her repaired. But the chief officer on August 2d, not only stated that he was satisfied with the condition of the holds, but gave the subcharterers a certificate by letter that "the linings were taken down and everything done to his satisfaction." There were no such obligations resting on the charterers for repairs as required them to hold the vessel; and as I have said, the owners took her themselves on August 1st for their own uses. All the further cleaning required might have been done while the vessel was on dry dock for the owners' benefit. There was, therefore, no necessary detention of the vessel after August 1st.

From the evidence I have no doubt that the asphalt on August 1st was not altogether cleaned off. The master says that he paid $151.35 for the subsequent cleaning, including the cost of one barrel of lime and one of cement. The work, he says, was mostly done by his crew on Sunday, August 7th. But from the other testimony of the subcharterers' witnesses, I am not warranted in charging the defendants with any such amount for cleaning properly belonging to them to do, though no doubt the master paid the sum stated for getting the ship in readiness for delivery the following Tuesday under the new charter. On August 6th there was some asphalt adhering to web frames and stringers; but the mate had stated that they would clean this themselves; and Capt. Chamberlain, the defendants' surveyor, testified that the asphalt cleaning that remained on August 6th, could be done by a half dozen men in half a day or a day. Mr. Butler testifies that the master told him the cleaning cost $18, which he offered him, with $50 additional for taking down the linings, which the master refused. The master testifies that the offer was on August 6th for the cost of doing the cleaning that still remained to be done. Upon this conflicting testimony I find that the sum offered by Mr. Butler, viz., $68, will be ample compensation for the cleaning.

5. Sugar damage to the amount of $224 is claimed by the respondents against the libelant, caused by an accumulation of water in the

bilges in compartment No. 1 during unloading. The accumulation arose from unloading first at the stern, giving the ship about 4 to 5 feet greater depth forward, and from the stoppage of the suction pump, which prevented carrying the water off. The defendants charge unseaworthiness of the ship as respects the pumps; but the evidence negatives this, since it appears that the vessel had been an equal amount down by the head in Trinidad without injury to the cargo. The inference, therefore, is that the stoppage was an incident and accident of the voyage, and not through any fault of the ship; so that the risk of the method of discharge adopted by the subcharterers or by the consignee, whoever was the actual director, lay upon them and not upon the libelant. The fact that no claim for this damage had been made upon the subcharterers, tends to confirm this conclusion. I disallow this item.

6. I think the libelant is answerable for the item of $20.60 for the loss of four bags of sugar while loading, due to bad splicing by the seamen of slings supplied by the charterer according to the agreement. The ropes were new, and bad work in splicing was the only cause of the accident. By supplying "slings" is meant the rope for making them. The subcharterers should, therefore, be credited with this item. Decree against the respondents for $168.80 and interest from August 6, 1898, and costs, with directions to collect first from the Trinidad Shipping & Trading Company, and next from the defendant Munson any balance not collectible by execution from that company.