## CORPORATION COURT OF THE CITY OF BRISTOL

Samuel Bruner et al.

v.

Lindsay Bunting et al.

September, 1909

## By JUDGE JOSEPH L. KELLY

This Court having already held, for reasons stated in writing and filed with the record, that, under the facts as alleged and conceded in this case, the Treasurer's certified list used by the judges of the election was conclusive upon the question of personal prepayment of poll-taxes, the question of chief importance remaining undecided is as to the legality of certain votes cast for, and certain votes cast against license, by persons alleged to have been non-residents of the city.

It is charged in the complaint that eighty-three persons, who were not residents of the city within the requirements of the law, voted for license at the election in question, and the answer makes a counter charge to the same effect as to forty-nine persons alleged to have voted against license.

A correct decision of the question thus raised will involve, first, a determination of the law as to what constitutes "residence" within the meaning of the suffrage laws of the State of Virginia, and, second, an application of the law as thus determined to the case of each individual whose vote is called in question.

The qualifications of voters at local option elections

are fixed by Section 62 of the Code as amended by the Act of February 25th, 1908, which provides that:

> every male citizen of the United States twenty-one years old, who has been a resident of the state for two years, of the county, city or town for one year, and of the precinct in which he offers to vote thirty days, next preceding the election, who has been duly registered, &c. . . . shall have the right to vote . . . but removal from one precinct to another in the same county, city or town shall not deprive any person of his right to vote in the precinct from which he has removed until the expiration of thirty days from such removal.

The word "residence" has more than one meaning in law, depending upon the connection in which it is used. For example, it is well settled that one may be a resident of a place for the purpose of voting there, and at the same time a non-resident of that place within the meaning of the attachment laws. (4 Minor, *Institute*, 3d ed., p. 412.)

In the case of *Long v. Ryan*, 71 Va. (30 Gratt.) 718 (1878), Judge Staples, in delivering the opinion of the Supreme Court of Appeals of Virginia, shows that "residence" within the meaning of the suffrage laws is clearly distinguishable from the same word as used in its popular sense to denote merely the act of abiding or dwelling in a given place. Both the word "residence" and the word "domicile" have been the occasion of more or less confusion by reason of the different meanings which they are used to convey in different connections. It may be safely said, however, that as used in the Virginia election laws, "residence" is substantially synonymous with "domicile" as the latter word is defined in the opinion of Judge Staples in *Long v. Ryan, supra.* He says:

> There is, however, a wide distinction between domicile and residence, recognized by the most approved authorities everywhere. Domicile is defined to be *residence* at a particular place, accompanied with positive or presumptive proof

of intention to remain there for an unlimited time. To constitute domicile two things must concur -- first, *residence*; secondly, the intention to remain there. *Pilson, Trustee v. Bushong*, 29 Gratt. 229; *Mitchell v. United States*, 21 Wall. (U.S.) 350. Domicile, therefore, means more than residence. A man may be a resident of a particular locality without having his domicile there. He can have but one domicile at one and the same time, at least for the same purpose, although he may have several residences.

In *Lindsay v. Murphy*, 76 Va. 428 (1882), Judge Burks, quoting with approval from a previous opinion of our Supreme Court written by him, said:

Residence, with no present intention of removal, constitutes domicile. Mere change of place is not change of domicile. Mere absence from a fixed home, however long continued, cannot work the change. There must be the *animus* to change the prior domicile for another. To constitute a new domicile two things must concur -- first, residence in the new locality; second, the intention to remain there. Until the new domicile is acquired, the old one remains; and whenever a change of domicile is alleged, the burden rests upon the party alleging it. These principles are said to be axiomatic.

In a comprehensive note to *Berry v. Wilcox*, 48 Am. St. Rep. 711, the annotator shows by a strong array of authorities too numerous to be repeated here, that every person must for all purposes have a legal residence or domicile somewhere; that he can have but one; that a domicile once acquired continues to exist until another is acquired elsewhere; that to effect a change of domicile there must be an actual abandonment of the former one coupled with an intent not to return to it, and also a new domicile acquired at another place, which can only be done by the union of intent and personal presence; that mere change of dwelling place, however long continued,

does not of itself constitute change of domicile; and that the burden of proving the abandonment of the old and the acquirement of the new is upon the party making the charge. (See also to same general effect *Pendleton v. Commonwealth*, [110 Va. 229 (1909)], decided at Staunton, Sept. 16, 1909, 65 S.E. 536.)

Mr. Raleigh Minor, in his work on *Conflict of Laws*, at page 114 (Sec. 59), says:

> It must be observed that neither presence alone, nor intention alone will suffice to create a domicile of choice. Both must concur, and at the very moment they do concur the domicile is created. As it is sometimes expressed the *factum* (presence) and the *animus* (intention) must unite. And thereafter no change of locality alone (there being no change of intent), or *vice versa*, no change of intention (there being no change of locality) will effect alteration of the domicile of choice, which remains where it was, until the factum and the animus again unite.

It is also settled law that where the intention of the party is in doubt, the fact of his returning regularly to vote, and the fact of his continuing to serve on juries at the place of former domicile, are among the best evidences that there has been no abandonment of the old, and no purpose to acquire a new one, *Mitchell v. United States*, 21 Wall., 14 Cyc. 862-3; *Minor on Conflict of Laws*, § 64; *Murray v. M'Carty*, 16 Va. (2 Munf.) 393 (1811); *Shelton v. Tiffin*, 6 How. (U.S.) 184.

And still another rule of law, of importance here, is that in cases of doubt the court should resolve the doubt in favor of the vote as cast and counted, and that full proof should be required to vitiate a vote when received and counted. *McCrary on Elections* (3d ed.) secs. 464, 465; 15 Cyc. 416-17, 419.

It would serve no good purpose to quote further from the authorities to show that the word "residence" as a prerequisite to the right to vote is not to be understood in its popular sense as denoting merely the act of abiding in a particular place. It is a word difficult

if not incapable of precise definition, because so largely dependent upon the special facts of each particular case in which it comes in question. I will not attempt any abstract definition, but it is safe to say and will be helpful in this case to remember, that the word as used in the suffrage laws expresses a distinct legal idea, and denotes a *relationship which the law creates between an individual and a particular locality.*

Few propositions have been more fully discussed and few better settled by the courts than those above announced; and the authorities already cited abound with references to many others of like tenor and effect.

Indeed the counsel in this case on both sides are substantially agreed upon the correctness of these propositions, and it is only when we come to apply the law as thus laid down to the facts of the case that any material difference arises.

It is earnestly contended on behalf of contestants that the very authorities above quoted in this opinion show that some of the persons whose votes are contested by them are illegal because the persons casting them had left the city and were out of the city at the time without any proof of a fixed or definite intention to return, and therefore, according to the very rules laid down in these authorities, had no domicile here. It is at this point that contestants, as the Court thinks, have fallen into error by failing to attach the proper importance to the fact that these persons had already acquired a legal residence, a domicile, in Bristol, Virginia, and that having done this, the domicile so acquired could not thereafter be lost by a mere change of place, however long continued. A change of place without the intent to abandon the old and acquire a new domicile will not work a change of legal residence. It is true that a change of dwelling is one of the facts to be considered in determining the intention of the party, but the authorities are practically a unit upon the proposition that a domicile, or a legal residence, once acquired in accordance with the requirements of the law of the place cannot be lost without the intention of the party, and that continuing in good faith and without fraudulent intent to vote in the old place after removal therefrom is one of the best tests of the intention. In other words, after the domicile

has once been perfected, the *bona fide* intention of the voter is thereafter decisive of the question whether it is or not to be changed, and the only difficulty which can arise about it is as to what such *bona fide* intention is. The actual situs of the person thereafter becomes of no importance except as an element in the determination of the party's real intention. This proposition is established by the overwhelming weight of authority, and when once clearly in mind will go far towards removing the confusion frequently surrounding the question of legal residence.

It is significant if not indeed convincing in this connection that the persons whose votes are here contested *would clearly not be entitled to vote anywhere else except in Bristol, Virginia.* The Court does not mean to say that every man always has a right to vote somewhere, but it does mean that every man must have a domicile somewhere at which he may vote if he has complied with the local laws. The law does not permit anybody to be without a domicile somewhere (Minor, *Conflict of Laws,* sect. 27). This domicile may not in itself entitle the party to vote at the place, because he may have made up his mind to abandon one and acquire another and this change of intention may not have concurred with his change of personal situs long enough to meet the requirements of the local law. But a man must always vote at his domicile if he votes at all; and he must always have a domicile somewhere. The proof is wholly lacking to show that these parties have ever intended to abandon the domicile previously acquired in Bristol, Virginia, or to acquire a new one in Tennessee or elsewhere; and without such intention a new domicile cannot be acquired. The contention of counsel for contestants, therefore, carried to its legitimate conclusion, *would produce the legally impossible result of leaving some, at least, of these contested voters without a domicile anywhere,* for it is perfectly clear that if they have none in Bristol, Virginia, they have none anywhere.

Most of authorities cited by counsel for contestants in support of their claim that certain voters have, by moving out of the city become residents of the places to which they have moved and have thereby lost their residence here, will be found, I think, to deal with the

*creation or acquirement* of a domicile of choice, and the argument based upon them leaves out of view the all-important and controlling fact that before the removal from the city a domicile or legal residence, had already been acquired here, which could not be lost except by its intentional abandonment.

An illustration from the record will, perhaps, make more clear this distinction between the continuance of a domicile once acquired on the one hand, and the acquirement of a new one on the other.

Take the case of M. A. Stull who lived in Bristol, Virginia, five years, and who, under any and every possible theory, it must be conceded, had established a domicile of choice or legal residence in Bristol, Virginia, and who thereafter moved across State Street to Bristol, Tennessee, The record is silent as to the purpose for which he moved, or the length of time he intended to remain, except that he says he has been residing there temporarily in rented property ever since. He has all the while kept his place of business in Bristol, Virginia, continuing to vote here during all these years, taking pains to register anew after the adoption of the new Constitution, educating his children in the Virginia public schools, serving regularly on the juries of the courts here, never seeking or intending to acquire citizenship or legal residence or right to vote anywhere else, refusing the request of friends that he change his legal residence to Tennessee, and throughout the whole period claiming his citizenship and legal residence in Virginia. Under this state of facts suppose he should now ask to be allowed to vote in Tennessee? Would he have any right to do so? Not the slightest if the law in Tennessee is anything like it is in Virginia. He would be, or should be, promptly met by the statement that not until he had in fact and in purpose abandoned his legal residence in Virginia and thereafter resided in Tennessee for the requisite period could he have any voting rights over there; for it is well settled that the right to vote cannot be retained in the old during the time one is acquiring it in the new domicile. If his removal across the state line had been accompanied by an abandonment of his citizenship and political rights here his personal residence over there would have been sufficient to entitle him to register

and vote there, in other words to acquire a new domicile of choice there. But until there has been a concurrence of his personal residence there with his intent to abandon the old and acquire a new domicile, the old one continues to exist. If this is not true, then Mr. Stull has no domicile anywhere, for it is certain that he has none in Tennessee and can have none until he undergoes a change of intention.

The case of Mr. Stull, which is conceded to be an extreme one, is selected by the Court as being fairly typical of a number of other voters both for and against license in the contested lists, who, with only a few exceptions, have not been living out of the city nearly so long as he has, but whose cases in other respects are substantially similar. In so far as they differ from Mr. Stull's case the difference is in most instances in favor of the legality of their votes. A few of the others in this class, unlike Mr. Stull, have bought property there, but the Court does not think this makes any material difference. It is a circumstance of much importance in determining the intentions of the parties, but is not in itself sufficient to show a change of domicile, especially in the face of the other affirmative proof to the contrary. If Mr. Stull's vote here had been called in question the next day after he moved across the line, then under the facts surrounding his removal, there could not have been, as the Court sees it, the slightest doubt as to the legality of the vote. The situation today, so far as the proof shows, does not differ from what it was the day after his removal, except as to the length of time during which he has lived outside, and lapse of time, as we have already seen, is not material. *If he had removed with the intention of abandoning the Virginia side permanently he would not have had the right to vote there at any moment thereafter until he had returned and acquired a new domicile there, which, as the law now is, would require a period of two years.* But not having removed with such intention and no subsequent change of intention being shown,his right to vote is as good now as it was the next day after his departure.

Another class of voters whose votes are contested, is the class as to which no proof was made except that when they voted and for some time prior thereto they were

living out of the city. To this class belong not only several persons who are alleged to have voted for saloons but also others who are alleged to have voted against saloons, and whose votes were, in the argument, conceded by counsel for contestants to be illegal. The Court, however, while commending the candor and consistency of counsel in this respect, is inclined to think that the concession is not warranted under the law, and has counted all such votes as good. The mere proof that a person is and has been living out of the voting place for any length of time, long or short, is probably not sufficient to show that the vote is illegal. The true rule would seem to be, upon reason and authority, that when a person's right to vote is challenged at the polls, proof that he is living outside of the precinct should put him upon his explanation, since he is there in person with every opportunity to make the explanation; but when he has been allowed to register and vote without any challenge, it would hardly seem fair, in a contest of the election to which he is not a party and of which, owing to his absence or other causes, he may not even be apprised, to count his vote out upon the mere proof that he was living out of the precinct at the time he voted. A contrary rule would not affect the result in this case, and a decision of the question is not essential; but the distinction between the effect of such proof as is here considered, at the polls and in an election contest respectively, would seem reasonable and is, I think, recognized by the authorities. (See *McCrary on Elections*, 4th ed., secs. 499 and 500.)

The foregoing observations are sufficient to indicate the rules of law which I think are applicable to this case in the determination of what constitutes residence.

The Court could not, of course, within the reasonable limits of any written opinion on the subject undertake to discuss the special facts as shown by the evidence surrounding the case of each person whose vote is contested. The evidence covers something over 800 typewritten pages, and it must suffice to say that a patient and careful consideration of this evidence, such as the Court has endeavored to give it, will show that the principles herein discussed are sufficient to form a correct basis for a decision upon the legality of all the votes which are

questioned on the ground of non-residence, whether the question be made by the contestants or the contestees. The same rules apply alike to both sides. The record contains many striking instances in which voters challenged by the contestants are situated exactly like others challenged by the contestees. The burden is upon the challenging party in every case. Applying the foregoing principles to the case of each contested voter, and weighing the evidence as best I could, I have reached the conclusion that a majority of legal votes were cast for license at the election in question. In coming to this conclusion I have not accorded legality to any voter on either side of the question who has not been shown to have in the first instance acquired a voting residence in Bristol, Virginia, or who, in the absence of proof to the contrary, must not be held to have done so as a presumption of law. Nor have I treated as legal the vote of any person who is shown to have abandoned his domicile here and acquired it somewhere else. I have not treated the mere fact of returning here to vote as conclusive of a party's intention as to his domicile for a domicile cannot be created or continued by imagination, but have only considered it as one of the circumstances entitled to great weight in determining the intention. No vote has been treated as legal where it has been shown that the voter has voted, or attempted to vote elsewhere, after acquiring his residence here, for I have treated that fact as sufficient to show the abandonment of his domicile here and a purpose to acquire it elsewhere.

Following these rules of decisions, I am of opinion that there were probably nine and certainly four votes cast for license which were illegal on the ground of non-residency; and certainly two and probably five votes cast against license which were likewise illegal; and in addition thereto, three illegal votes the character of which as being for or against license is perhaps not shown by legal proof. There were also two votes for license that were illegal because the parties casting them had previously been convicted of crime and their disabilities not removed. The record discloses the names of the last two, and the Court does not deem it proper to mention the names of the others. They are not on trial here for illegal voting, and there is no charge that they intention-

ally or knowingly cast illegal ballots. Complainants might have proceeded prior to the election to purge the registration books, under Sections 86 and 83a of the Code, and in that proceeding the voters themselves would have been parties with a right of appeal to the Supreme Court and would have been bound by the result, but that is not true here.

The interesting question arising in the evidence and discussed in the argument as to what character of proof is proper to determine how a person votes when he does not testify on the point himself is not passed upon here, because its decision becomes unnecessary and immaterial in view of the Court's findings upon the other questions.

The argument of counsel for contestants based upon the expression in Section 62 of the Code "that removal from one precinct to another in the same county, city or town shall not deprive any person of his right to vote in the precinct to which he has moved until the expiration of thirty days after such removal," has been duly considered, but the Court does not think the provision in question conflicts with the conclusions hereinbefore announced. The provision merely preserves the right, which would otherwise be lost, to vote in a precinct which one has abandoned while acquiring the right to vote in a new precinct, to which he has permanently removed. Removal from a precinct, like removal from a city or county or state, does not under the elections laws imply, as we have already seen, merely a change of personal situs or of bodily presence, but implies a change of legal residence. Under the present law a man may change his "residence" in the legal sense from one precinct to another in a city or town and not lose it at the former precinct for thirty days, but if he changes it from the city or town altogether he instantly loses it and cannot exercise it again until he has had a legal residence in the place to which he has removed for the requisite length of time; and yet it is conceded that even under the contestants' theory of the law, a man may, in a proper case, remove from a city or town with his family and take up his abode elsewhere and remain there for a long period and still retain his legal residence at the place from which he has removed. The argument in question either proves too much or proves nothing at all.

As to the terms of the oath to be taken by a party whose vote is challenged, provided for in Section 127 of the Code, requiring him to swear that he is *at the time an "actual resident,"* it need only be said that this language in the oath has not been changed since the adoption of the new Constitution, and has never been given the strict literal meaning which is claimed for it by counsel for contestants. (*See Payne on Elections,* sec. 54.) Under the construction of this language as here contended for, it would be possible to successfully challenge the votes on many clearly qualified voters, including some of the most useful and distinguished citizens of the State. There is probably not a city or town in the State of which it could be said that all the persons qualified to vote there, are actual bodily residents, in the popular sense. At every election persons come from without the city or town or precinct and vote, and have the unquestioned and unquestionable right to do so. The number of such persons voting in Bristol is perhaps larger than in any other place of the same size because we have right across the state line another city in which it frequently happens that some of our people can find for the time being cheaper or more convenient quarters, and they go there temporarily, as they have the right to do, without permanently abandoning the city and state of the nativity or adoption. In all such cases the test is the same, and this test the Court has attempted to make clear in this opinion. In the local option election held here in July much interest was taken on both sides. A large vote was polled, and the evidence indicates that many men came from outside the city limits to vote, some from points in other states. I think that very few of the votes cast on either side were illegal, and that in any proper view of the case the correct returns show a majority of legal voters in favor of license. I am not sure that a construction of the law as contended for by complainants would have produced a different result, since that construction would invalidate a number of votes against license which I have held to be good. This, however, is not material, in view of what seems to me to be the law of the case.

Proceeding, therefore, as the statute directs me, upon what I deem the merits and according to the right of the case, I will enter an order dismissing the complaint

and allowing the result of the election to stand as returned by the judges.